**In re AIR CRASH DISASTER.**

**Chester H. POLEC, et al.; Kris Grigg, Mary Kahle, James Wennen, Earl Pearson, Carolyn Johnson, Suzanne Redd Ross, Victor Elfering, Marilyn Blakley, Bonnie Royden, David Charles Morris, Patricia Roundy, and Janet D. Cook, Plaintiffs,**

**v.**

**NORTHWEST AIRLINES, INC., Defendant–Appellant,**

**McDonnell Douglas Corporation, Defendant–Appellee.**

Nos. 91–2328, 92–1776 through 92-1787.

United States Court of Appeals, Sixth Circuit.

Argued Aug. 13, 1993.

Decided June 6, 1996.

510

Felix J. Gora (briefed), Ralph F. Mitchell, Rendigs, Fry, Kiely & Dennis, Cincinnati, OH, Leonard E. Nagi, Paskin, Nagi, & Baxter, Detroit, MI, Carroll E. Dubuc, Michael H. Selter (argued and briefed), Aidan D. Jones, Graham & James, Washington, DC, for Northwest Airlines, Inc. in No. 91-2328

Felix J. Gora (briefed), Ralph F. Mitchell, Rendigs, Fry, Kiely & Dennis, Cincinnati, OH, Leonard E. Nagi, Paskin, Nagi, & Baxter, Detroit, MI, Carroll E. Dubuc, Michael H. Selter (argued and briefed), William D. Evans, Jr., Graham & James, Washington, DC, for Northwest Airlines, Inc. in Nos. 92-1776 through 92-1787.

Donald E. Shely, Dykema, Gossett, Spencer, Goodnow & Trigg, Bloomfield Hills, MI, Jeffrey W. Morof, Bryan & Cave, Los Angeles, CA, Douglas E. Winter (argued and briefed), Bryan, Cave, McPheeters & McRoberts, Washington, DC, for McDonnell Douglas Corp. in Nos. 92-1776 through 92-1787, 92-2328.

Before: MERRITT, Chief Judge; and ENGEL and BOGGS, Circuit Judges.

BOGGS, Circuit Judge.

This case concerns who is responsible for the crash of Northwest Flight 255 on August 16, 1987, the second-worst aviation disaster in American history. The crash killed one hundred fifty-four passengers and crew, and two bystanders. A jury found that Northwest Airlines was liable for one hundred percent of the injuries and deaths caused by the crash. Northwest appeals. Northwest also appeals the district court's holding that McDonnell Douglas, the manufacturer of the crashed airplane, can recover from Northwest, under a theory of equitable subrogation, money that it paid to settle certain claims. We affirm both judgments.

I

Northwest Airlines Flight 255 crashed during takeoff from the Detroit Metropolitan Airport on August 16, 1987. The aircraft was an MD–80 model manufactured by McDonnell Douglas. The plane failed to gain sufficient altitude after takeoff, and struck a lamppost in the lot of a nearby National Car Rental office. The impact sheared off part of the wing, and the plane subsequently crashed into a highway overpass on Middlebelt Road. Evidence at trial indicated that the aircraft's crew had not properly set the plane's wing flaps and slats, which are necessary for lift. Fifteen seconds after takeoff, the plane was forty-two feet above the ground—according to the standard flight plan, it should have been at an altitude of 752 feet.

Following the accident, some 160 plaintiffs sued Northwest and McDonnell Douglas. In addition, Northwest and McDonnell Douglas filed claims against each other. The Judicial Panel on Multidistrict Litigation consolidated all federal cases in the United States District Court for the Eastern District of Michigan, before Chief Judge Julian Abele Cook, Jr., pursuant to 28 U.S.C. § 1407. *In re Air Crash Disaster at Detroit Metro. Airport,* 674 F.Supp. 27, 28 (J.P.M.L.1987). Judge Cook appointed a Plaintiffs' Steering Committee, consisting of six experienced mass disaster attorneys. *In re Air Crash Disaster at Detroit Metro. Airport,* 737 F.Supp. 396 (E.D.Mich.1989). The PSC, Northwest, and McDonnell Douglas agreed to a discovery and pretrial schedule. Practice and Procedure Order No. 2,[1] and Amendment, March

---

1. In Practice and Procedure Order No. 2, the court directed that "on or about July 15, 1988, depositions on the issue of liability may proceed" and all plaintiffs' factual liability discovery "shall be completed by December 30, 1988. All discovery of experts on the issue of liability shall be completed by March 31, 1989," unless new facts, theories or issues were raised in experts' deposi-

23, 1989.[2]

On November 30, 1988, Northwest filed third-party complaints for contribution and indemnity against Texas Instruments (TI), National Car Rental System, Inc. (National), and the United States.[3] TI manufactured a circuit breaker used in the aircraft's warning system. Northwest alleged that the circuit breaker failed, causing the warning system to fail also. Northwest contended that National's placement of its lamppost violated Federal Aviation Administration (FAA) regulations, and that the accident would not have occurred had the post been properly placed. The plaintiffs moved to sever TI, National, and the United States on January 12, 1989, arguing that Northwest's proceedings against TI and National were "instituted at this late date solely for the purpose of promoting delay." The court denied the motion, noting that the Practice and Procedure Order No. 2 "allowed any defendant to file a third-party complaint with the court on or before November 30, 1988," and stating that it still expected "factual liability discovery" to close by February 15, 1989. Order, January 12, 1989, at 2. After a hearing, however, the court reconsidered its position and granted the motion, severing the claims against TI and National. Order, February 23, 1989. The court requested Northwest to provide a list of depositions noticed, but not commenced or completed, by the close of discovery on February 15. The court would consider which of these depositions, if any, could continue. *Id.* at 2.

Northwest petitioned this court for a writ of mandamus to reverse the court's February 23, 1989 order. We denied the petition in *In re Air Crash Disaster at Detroit Metro. Airport*, No. 89-1457, 1989 WL 62513 (6th Cir. June 13, 1989).

Initially, the trial court had identified an exemplar case to try on issues of liability.

However, "rather than preside over the claims of an individual plaintiff, as was previously scheduled," on August 18, 1989, the trial court transferred all pending federal cases to itself for trial, pursuant to 28 U.S.C. § 1404 and Rule 14(b) of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation. *In re Air Crash Disaster at Detroit Metro. Airport*, 737 F.Supp. 391, 393 (E.D.Mich.1989).

"After considering various proposals with respect to the procedure for addressing all of the issues in the case," the court broke the trial into three parts: (1) a joint liability trial involving all the plaintiffs' claims against Northwest and McDonnell Douglas, and of all claims for contribution and indemnity between Northwest and McDonnell Douglas; (2) damage trials to determine the amount of the compensation that would be payable to the plaintiffs; and (3) a second liability trial to resolve Northwest's claims against TI and National. *In re Air Crash at Detroit Metro. Airport*, 791 F.Supp. 1204, 1209 (E.D.Mich. 1992). The present appeal is only concerned with the joint liability trial.

Before trial, Northwest entered into "damages only" settlements with sixty passengers. Northwest agreed not to contest liability for compensatory damages, and the sixty plaintiffs agreed not to seek punitive damages. As part of the settlement, McDonnell Douglas waived the exculpatory clause of the Aircraft Purchase Agreement, which would otherwise immunize McDonnell Douglas from liability to Northwest, except in instances of fraud. Stipulation between Northwest Airlines and McDonnell Douglas, December 12, 1988 (sealed); *see also In re Air Crash Disaster at Detroit Metro. Airport*, 757 F.Supp. 804, 806 n. 4 (E.D.Mich.1989)(containing language of Purchase Agreement's exculpatory clause); *id.* at 807 n. 5 (stating that McDonnell Douglas waives the exculpatory clause in

tions, in which case depositions could continue through June 1989. The court also required that defendants "file any amendments to their pleadings (including the addition of third-party defendants)" by November 30, 1988.

**2.** This amendment incorporated changes made at the December 16, 1988 and March 16, 1989 status conferences. The changes extended the deadlines for factual liability discovery and depo-

sitions of expert witnesses. The new order also instructed parties to submit recommendations for which case the court should choose as an "exemplar" case to try on the liability issues.

**3.** The court later dismissed the United States as a party to the litigation with the consent of Northwest. Order, December 5, 1989.

cases where Northwest stipulates to liability). In return, Northwest secured plaintiffs' release of McDonnell Douglas, dismissed its fraud claims against McDonnell Douglas, and agreed to seek contribution at trial for the money it paid to the sixty plaintiffs under traditional products liability theories only.

Northwest *partially* settled claims by another group of plaintiffs, against whom it claimed "special defenses." Some of the "special defense" cases involved international tickets. Northwest asserted that the $75,000 liability limit under the Warsaw Convention applied to these claims absent a finding of "willful misconduct." Order, Nov. 6, 1990 (sealed). Other "special defense" claims involved off-duty Northwest employees traveling on passes. The terms of these passes exculpated Northwest from liability absent a finding of "willful or wanton misconduct." [4] Still other "special defense" claims involved on-duty flight attendants, against whom workers' compensation served as a partial defense for Northwest.

McDonnell Douglas settled separately with the special defense plaintiffs, preserving, in its words, a "right" to "recover over" from Northwest. At trial, McDonnell Douglas sought reimbursement from Northwest pursuant to the doctrine of equitable subrogation.

These various settlements left a group of eighty plaintiffs still seeking recovery from Northwest and McDonnell Douglas on the eve of trial. Northwest settled with these plaintiffs after jury selection, but before opening statements. In the settlement, Northwest paid compensatory damages, but did *not* obtain a release of McDonnell Douglas.

At trial, the eighty plaintiffs and Northwest each proceeded separately against McDonnell Douglas, while McDonnell Douglas proceeded against Northwest for reimbursement of the money it paid to settle the special defense cases. The trial began with the eighty plaintiffs' case-in-chief. Through a series of witnesses beginning on October 12, 1989, the plaintiffs presented evidence explaining the general facts of the crash. The plaintiffs called expert witnesses who testified that the plane was impossible to control at stall in violation of FAA regulations, that a warning system intended to alert the crew if the slats and flaps were not set correctly ("Central Aural Warning System," or "CAWS") malfunctioned, and that a circuit breaker that supplied power to the CAWS (the "P–40" circuit breaker) was unreliable.

After the plaintiffs had presented their affirmative evidence, McDonnell Douglas moved for a directed verdict in its favor. While this motion was pending, McDonnell Douglas settled with the plaintiffs. McDonnell Douglas, for whatever reason, did not seek contribution from Northwest for the money it paid out in this settlement. Order, October 1, 1990, at 2. The jury did not decide the parties' respective liability for injuries to these plaintiffs; and no issue related to these plaintiffs, the only plaintiffs who took part in the trial, is now on appeal. Determining that no plaintiffs remained in the case, the court eventually dismissed the Plaintiffs' Steering Committee. Order, September 4, 1990.

Meanwhile, the fight between Northwest and McDonnell Douglas regarding their *earlier* settlements with the *other* plaintiffs continued. Since the remaining claims had nothing to do with the plaintiffs who had created most of the evidentiary record in the action, McDonnell Douglas moved for a new trial before a new jury. Northwest opposed this motion, which the trial court denied. The court reasoned:

> The theories of the PSC and Northwest are similar. . . . On the basis of past experience in this case, the court is absolutely confident that this jury will follow any cautionary instruction that it is to disregard the claims of the Plaintiffs and focus solely on the issues which divide Northwest and MDC.

Order, September 5, 1990. McDonnell Douglas then moved to strike the expert opinion testimony proffered by the now-dis-

---

**4.** *See generally Morris v. Northwest Airlines,* 737 F.Supp. 422, 424 (E.D.Mich.1989) (containing language of exculpatory clause in employee passes and holding clause valid under federal common law).

missed plaintiffs. Over Northwest's objection (the expert testimony was damaging to McDonnell Douglas), the court obliged, stating:

> The case and controversy that once existed between MDC and the Plaintiffs is no longer present. Logic dictates that the Plaintiffs' expert testimony should be declared to be moot and stricken because the claims which the testimony was offered to support do not exist.... In the joint final pretrial order, each party listed, among other items, its theory of the case, an identification of the issues of fact and law to be litigated, and its expert witnesses.... This court believes that Northwest's case, as outlined in the joint final pretrial order, must proceed on the testimony of its own witnesses, also as outlined in the joint final pretrial order.

Order, October 1, 1990.

McDonnell Douglas began its case-in-chief in January 1990. It presented evidence to support its theory of the case, which was essentially as follows. The flight crew, who had a history of negligence, did not follow various checklists required by FAA regulations and Northwest's own rules. As a result, the flight crew forgot to configure the plane for takeoff. The mistake could have been caught by the aural warning system, a system that FAA regulations did not *require* manufacturers to install, but the crew had made a habit of pulling out the circuit breaker that supplies power to the warning system because they were bothered by its beeping. After lift-off, another warning system installed in the plane (the "stick-shaker") informed the crew of its horrible mistake, but the crew made poor decisions in the few seconds it had to avoid a crash.[5]

Northwest responded to this evidence with cross-examination and evidence of its own. Northwest disputed that the crew forgot to configure the plane for takeoff, but this allegation was not the heart of its case. Instead, Northwest put on exhaustive evidence, including the testimony of twenty-four experts, in support of its contention that various design defects exacerbated the crew's mistake. According to Northwest, the aural warning system did not function because the circuit breaker wired to the system was defective. Had the breaker worked, the aural warning system would have worked, and the crew would have aborted the takeoff. Northwest also presented evidence that the plane did not handle well at stall, and had a misleading flight director, the computerized display that helps pilots orient the plane during flight.[6]

Eventually, after eighteen months of trial (extended somewhat by recesses for the resolution of various motions and the conducting of additional discovery), the court presented the two claims remaining in the case to the jury. One claim was Northwest's action for contribution from McDonnell Douglas for its pre-trial settlement with the first sixty passengers. The other claim was McDonnell Douglas's action under equitable subrogation doctrine for reimbursement of the money it paid to settle with the "special defense" passengers.

On May 8, 1991, the jury by special verdict form found that Northwest was liable for one hundred percent of the damages from the accident. It found against Northwest on all Northwest's claims for contribution; and it found in favor of McDonnell Douglas on all of McDonnell Douglas's claims for reimbursement (except the claim for negligent entrustment). The district court entered final judgment on all claims as between Northwest and McDonnell Douglas on May 31, 1991.

Northwest moved the court for a judgment notwithstanding the verdict or, in the alternative, for a new trial. Northwest also con-

---

**5.** Legally, McDonnell Douglas's claims rested on several theories: (1) negligence by Northwest's crew; (2) negligence by Northwest's management in training and supervising the crew; (3) negligence in failing to comply with government regulations; (4) negligent entrustment; (5) willful or wanton misconduct under Michigan law; (6) willful misconduct under federal law; and (7) intentional misconduct.

**6.** Legally, Northwest's attack on the MD–80's design and safety system rested on several theories: (1) strict liability for defective manufacture; (2) strict liability for defective design; (3) strict liability for failure to warn; (4) negligent manufacture; (5) negligent design; (6) negligent failure to warn; and (7) negligent failure to comply with government regulations.

tended that, since the jury did not find McDonnell Douglas at fault, it could not recover from Northwest the settlements it paid on the "special defenses" claims.[7] The district court denied Northwest's motion, holding that McDonnell Douglas, even if without fault, could recover under Michigan's doctrine of equitable subrogation. *In re Air Crash at Detroit Metro. Airport,* 791 F.Supp. 1204, 1233–38 (E.D.Mich.1992).[8]

There are two appeals now before this court. The denial of Northwest's claim for contribution from McDonnell Douglas arising from the settlement with the 60–passenger group is on appeal as No. 91–2328. The judgment granting McDonnell Douglas reimbursement for its settlement with the "special defenses" passengers are on appeal as Nos. 92–1776 through 92–1787. In Part II, pages 11 to 66, we will address the issues raised by Northwest's appeal in No. 91–2328. In Part III, pages 66 to 93, we will consider the issues raised in Nos. 92–1776 through 92–1787.

## II

Northwest raises nine issues on appeal in 91–2328. We can summarize them as follows:

1. The court erred by severing Northwest's third party claims against TI and National, depriving Northwest "of relevant discovery and a fair trial."

2. The court erred by not recognizing that it had the discretion under 28 U.S.C. § 1870 to treat Northwest and McDonnell Douglas as hostile parties and give each of them more peremptory challenges.

3. The court struck relevant expert testimony presented by the plaintiffs that

Northwest contends should have been admitted pursuant to Northwest's settlement agreement with the plaintiffs.

4. The court erred by "requiring" Northwest to present evidence of the liability disclaimer on the tickets of the Warsaw Convention and Employee Pass passengers, and by failing to remove that evidence from the jury's consideration.

5. The court erred by allowing a former Northwest employee, Edward Gilbertson, to testify for McDonnell Douglas as an expert rebuttal witness, by allowing him to testify to hearsay, and by allowing him to testify on matters beyond the scope of the issue he was called to rebut.

6. The court erred by refusing Northwest's request to present certain rebuttal testimony.

7. The court made a variety of other erroneous evidentiary rulings:

(a) admitting evidence about Capt. Maus's training by Republic Airlines;

(b) admitting the cockpit voice recorder transcript prepared during the Federal Transportation Safety Board's investigation of the accident;

(c) allowing McDonnell Douglas to present a video to the jury depicting the circuit breaker;

(d) excluding evidence about Northwest's post-accident rewiring of the aural warning systems on its MD–80 fleet;

(e) excluding evidence related to the flight director system's inaccuracy during takeoff;

(f) excluding Exhibit 297, an internal McDonnell Douglas memo that stated

7. Although details of the settlements are under seal, McDonnell Douglas states in its brief on appeal that it paid "approximately $25 million in settlement of all 16 [special defense] actions, of which $21 million is recoverable from Northwest." McDonnell Douglas Br. in case Nos. 92–1776 *et seq.* at 4. Subsequent references to the briefs of either party (Br.) will be to the briefs in case No. 91–2328, unless otherwise noted.

8. The court also granted TI's motion for summary judgment on Northwest's third-party claim against it alleging defects in the circuit breaker. The court determined that these issues were litigated in the instant case, and decided against

Northwest. In light of the jury verdict against Northwest, the court granted TI's motion for summary judgment on collateral estoppel grounds. 791 F.Supp. at 1218. The court also granted summary judgment for National on Northwest's claim for contribution against National, holding that the jury's determination that Northwest had committed willful and wanton misconduct barred Northwest from obtaining contribution from National under Michigan law. *Id.* at 1227. The court also granted National summary judgment against Northwest's indemnification claims. *Id.* at 1231.

McDonnell Douglas believed a check of the takeoff warning before each fight was unnecessary since the CAWS fail light would warn crews about system failure; and

(g) precluding Northwest from cross-examining McDonnell Douglas's human factors expert Capt. Hawkins about his accident on takeoff in 1953.

8. The court gave erroneous jury instructions:

(a) on McDonnell Douglas's right to assume that Northwest would obey the law, from which the jury could determine whether Northwest's conduct was foreseeable to McDonnell Douglas;

(b) on McDonnell Douglas's sophisticated user defense; and

(c) on the significance of Northwest's violation of FAA maintenance regulations.

9. The court allowed improper vouching (and inflammatory references to the irrelevant ticketing evidence) in McDonnell Douglas's closing argument.

For the sake of coherence, we divide Northwest's appeal into three major categories. In the first category, discussed in Section A below, pp. 13 to 35, are those claims on appeal involving issues of law, numbered above as issues 1, 2, 8, and 9. In the second category, discussed in Section B, pp. 35 to 50, are those claims involving the allegedly improper *exclusion* of evidence, numbered as issues 3, 6, and 7(d)-(g). The third category, discussed in Section C, pp. 50 to 65, involves the allegedly improper *admission* of evidence, identified in issues 4, 5, and 7(a)-(c).

## A

**1. Severing the Third–Party Claims and Closing Discovery**

▋ The first of Northwest's contentions of law is that the court erred by severing its claims against TI and National, and by closing discovery on February 15, 1989. Fed.R.Civ.P. 42(b) provides for separate trials "in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy." "[M]atters of docket control and conduct of discovery are committed to the sound discretion of the district court. We will not interfere with a trial court's control of its docket except upon the clearest showing that the procedures have resulted in actual and substantial prejudice to the complaining litigant." *In re Fine Paper Antitrust Litigation,* 685 F.2d 810, 817 (3d Cir.1982) (citations and internal quotation omitted), *cert. denied,* 459 U.S. 1156, 103 S.Ct. 801, 74 L.Ed.2d 1003 (1983); *see also City of Mount Clemens v. EPA,* 917 F.2d 908, 914 (6th Cir.1990).

At the December 16, 1988 status conference, at the request of McDonnell Douglas's counsel, the court asked all parties whether extending the deadline for deposing liability experts to February 15, 1989 would give them sufficient time. Northwest's counsel responded "I think we can probably do it by the 15th," but then expressed concern that, since Northwest did not have control over "some witnesses," this might cause delay through no fault of Northwest. Transcript, Status Conference, December 16, 1988, at 48–49. The court nevertheless decided to require that the parties list and depose their experts by February 15. The court also provided an additional thirty-day "window" in which the parties could familiarize their experts with the latest depositions, before specifying the content of the experts' testimony to the other parties and the court. *Id.* at 51. The parties agreed to this schedule.

Northwest argues that severance of its claims against TI and National improperly precluded it from presenting its evidence to the jury, and denied it discovery "of critical evidence and witnesses" from TI and National. Northwest contends that "the presence of TI and [National] in the initial liability trial, and the accompanying full airing of Northwest's claims against them, would have precluded the jury's finding Northwest liable for willful and wanton misconduct." Northwest Br. at 19. Northwest emphasizes that, in a dissent to this court's denial of Northwest's petition for a writ of mandamus, Judge Wellford stated that he would grant mandamus, since he believed that severance of TI and National "would require two lengthy trials involving essentially the same

issues." Additionally, Judge Wellford believed that "the few months of discovery permitted Northwest Airlines on its third party claims seems both inadequate and unfair in the face of massive claims made against Northwest." *In re Air Crash Disaster*, No. 89–1457, slip op. at 1–3, 1989 WL 62513, at *1–4 (6th Cir. June 19, 1989) (Wellford, J., dissenting). Northwest also argues that the court's severance order was contrary to the law-of-the-case doctrine.

■ McDonnell Douglas notes that Northwest filed its claims against TI and National on the last day allowed under the discovery schedule. McDonnell Douglas argues that severance "was an appropriate exercise of judicial discretion, particularly given Northwest's failure to comply with the agreed discovery schedule, the public interest in assuring prompt compensation of innocent plaintiffs, and the additional expense to which plaintiffs and all other parties would have been put." McDonnell Douglas Br. at 14. McDonnell Douglas notes that Northwest agreed to this schedule during the December status conference, and that "[a]ny potential prejudice is of Northwest's own making: Despite knowing the facts supporting the third-party complaints for at least a year,[9] Northwest waited until the last possible moment to join and seek discovery from these parties, then squandered its remaining opportunity for discovery" by using the extension until February 15 to take discovery from McDonnell Douglas. *Id.* at 15. McDonnell Douglas also argues that Northwest waived this issue by opposing McDonnell Douglas's motion to excuse the jury and begin a new trial after the plaintiffs were dismissed from the action. Had Northwest agreed to McDonnell Douglas's motion, it could have obtained a single trial that included TI and National, and additional discovery.

In the court's September 5, 1990 order denying McDonnell Douglas's motion for a

new trial, it is by no means clear that the court would have granted a new trial, absent Northwest's opposition. The court considered whether continuing the trial would prejudice McDonnell Douglas, not Northwest. Order at 7–14. The court addressed each of McDonnell Douglas's contentions thoroughly and determined, within its discretion, that continuing the trial with the same jury would not deprive McDonnell Douglas of a fair and impartial adjudication. *Ibid.* The court's reasoning would have been as persuasive in the absence of Northwest's opposition, since prejudice (or lack thereof) to Northwest was not dispositive.

■ Furthermore, had the court granted McDonnell Douglas's motion for a mistrial, it is by no means certain that the court would have chosen to hold a trial that included TI and National, and to extend discovery. Therefore, Northwest's opposition to the mistrial motion did not demonstrate that Northwest had rejected an opportunity to obtain the same relief it seeks in its current challenge to the court's severance decision, since a mistrial would not necessarily have yielded the same result for Northwest. "A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). *See also Pitts v. American Sec. Life Ins. Co.*, 931 F.2d 351, 357 (5th Cir.1991); *J.H. Cohn & Co. v. American Appraisal Assocs., Inc.*, 628 F.2d 994, 1000 (7th Cir.1980). We decline to hold that Northwest waived its severance argument by opposing McDonnell Douglas's motion for a mistrial.

■ Reaching the merits of Northwest's allegations of error, we hold that the court properly exercised its discretion by severing the claims against TI and National, and by adhering to the agreed discovery schedule, as revised in the December status conference. To do otherwise would have thwarted the court's trial date goal.[10] We note that a trial court may control discovery, even if it means altering earlier rulings about the discovery

---

9. McDonnell Douglas argues that Northwest's counsel, in a June 13, 1988 letter, informed all parties that it believed TI, National, and the United States were also responsible for the accident. McDonnell Douglas also states that Northwest indicated TI would be included in its first

round of depositions in a June 23 letter. These letters were attachments to McDonnell Douglas's opposition to Northwest's motion to extend discovery of February 8, 1989.

10. Northwest claims that the court's decision ignored judicial economy and the created a "cir-

schedule, without being constrained by the law-of-the-case doctrine. "It is well established that the interlocutory orders and rulings made pre-trial by a district judge are subject to modification by the district judge at any time prior to final judgment...." *In re "Agent Orange" Product Liability Litig.,* 733 F.2d 10, 13 (2d Cir.1984). *See also In re George Worthington Co.,* 921 F.2d 626, 628 (6th Cir.1990).

We note further that Northwest was allowed to place evidence before the jury on the possible liability of TI and National. We also note that Michigan law, applicable in this case on this issue, does not require a court to apportion liability between all potential parties in a single action. Michigan law, like the law of most other states, allows subsequent actions for contribution or indemnity. M.C.L. § 600.2925a(1), (5). Hence, we cannot find any prejudice to Northwest from the court's severance and discovery rulings.

**2. Limiting Northwest's Peremptory Challenges**

■ The second issue of law on appeal is Northwest's claim that the district court erred by not understanding that it had the discretion to allow the two defendants together more than three preemptory challenges for regular jurors. Northwest contends that it was prejudiced by the lack of additional peremptory challenges, "because Northwest would have excluded either regular Juror No. 385 or regular Juror No. 509 ... and would have excluded alternate Juror No. 106 if given the opportunity.... Northwest did not have sufficient peremptory challenges to ensure a fair and impartial jury."[11] Northwest Br. at 23. The transcript of the jury selection proceedings is under seal. References to the sealed part of the trial transcript in the following opinion can be identified by their citation to volume numbers 1 through 8.

A trial court has broad discretion under 28 U.S.C. § 1870 to allocate peremptory challenges and to set the procedure and manner in which the challenges are executed. *United ed States v. Mosely,* 810 F.2d 93, 97 (6th Cir.)(citing *Gafford v. Star Fish & Oyster Co.,* 475 F.2d 767 (5th Cir.1973)), *cert. denied,*

cuity of action." However, we believe that the district court properly considered possible complexities. Indeed, the jury's verdict against Northwest provided a basis upon which to dismiss Northwest's pending claims against TI and National. *In re Air Crash at Detroit Metro. Airport,* 791 F.Supp. at 1218, 1227 (dismissing third-party claims on grounds of collateral estoppel).

11. Northwest argues that regular Juror No. 385 was employed part-time by the *Detroit News,* which reported extensively on the accident, and that this juror had revealed she "hated mergers." Northwest explains that Northwest's merger with Republic, and its impact on safety, was an issue in this trial. Northwest Br. at 23 n. 24. Juror 385 explained that, while she did not like her employer's merger, the fact that Northwest had merged with Republic "wouldn't make any difference to me." 3 Transcript at 98, 109. She also stated she had not spoken at work with anyone about the accident. *Id.* at 102. Northwest challenged this juror for cause, because of the "merger issue," but the court rejected this challenge. *Id.* at 112.

Northwest argues that regular Juror No. 509 revealed that his sister and the sister's child had been involved in a rough landing of a private plane, 2 Transcript at 182, admitted to having a fear of flying, *id.* at 74–85, and expressed reservations about being able to follow the court's instructions on the law, *id.* at 79–80. The juror stated that his fear of flying would not cause him to be biased against either or both of the defendants or the plaintiffs, *id.* at 89–90. Northwest unsuccessfully challenged Juror 509 for cause, based upon the juror's problems with rearranging his wife's transportation to work during the trial. *Id.* at 95.

Northwest argues that alternate Juror No. 106 had "unexplained inconsistencies between her responses to the juror questionnaire and to voir dire questions, including whether she had a fear of flying and could decide the case based solely on the evidence." Northwest Br. at 23 n. 24. Juror 106 stated that she had never flown, but that people had said to her "never to fly Northwest because it's trouble." 3 Transcript at 214–15. However, in response to the judge's questions, this juror stated she would not have a problem flying, and would not hesitate to fly Northwest, or fly in a plane manufactured by McDonnell Douglas. *Id.* at 216–17. She also gave inconsistent answers about whether serving as a juror would prove to be a hardship. *Id.* at 230–34. Both McDonnell Douglas and Northwest challenged this juror for cause, based upon the inconsistencies between her questionnaire and her voir dire answers, and the possibility that she might come to regard jury service as a hardship. The court rejected their challenges, stating that the juror had explained adequately the apparent inconsistencies. *Id.* at 252.

484 U.S. 841, 108 S.Ct. 129, 98 L.Ed.2d 87 (1987); *Fedorchick v. Massey–Ferguson, Inc.*, 577 F.2d 856 (3d Cir.1978).

During jury selection, the district court denied Northwest's motion that McDonnell Douglas and Northwest should have six peremptory challenges each, three under 28 U.S.C. § 1870[12] for use against regular jurors, and three under Fed.R.Civ.P. 47(b)[13] for use against alternate jurors. The court stated:

It has been argued by the defendants that the interests are varied, and thus, they are not at all united in their opposition to the plaintiffs. While it may be true ... there is a commonality, in that they both seek to avoid being assessed damages.... [I]f this Court attempted to incorporate and to assign peremptory challenges to each interest group, then the number would be astronomical.... The motion, if granted, would have given to each of the defendants an additional three peremptory challenges, giving to the defendants a total of 12 peremptory challenges, as opposed to the plaintiffs' six. This Court believes that such an allocation would not only be inequitable, but it would also be illegal.... [28 U.S.C. § 1870], in the judgment of this Court, gives to it the discretion to determine after reviewing all of the parts [of § 1870], whether the several defendants, in this instance, McDonnell Douglas and Northwest, should be considered as a single party for the purpose of making a challenge, or the Court should treat them as separate entities.... The Court believes in its discretion that it is proper, it is equitable and legal for each side, the plaintiffs and the defendants, to have a total of six peremptory challenges.

12. Title 28 U.S.C. § 1870 reads:

In civil cases, each party shall be entitled to three peremptory challenges. Several defendants or several plaintiffs may be considered as a single party for the purposes of making challenges, or the court may allow additional peremptory challenges and permit them to be exercised separately or jointly.

13. The version of Fed.R.Civ.P. 47(b) in effect at the time of trial read:

(b) Alternate Jurors. The court may direct that not more than six jurors in addition to the

7 Transcript at 38–41. Later in the same hearing, however, the court amended its ruling:

I will give to each side a total of eight peremptory challenges. The plaintiffs and the defendants will allocate four peremptory challenges to the members of the regular jury panel, and four to the alternate jurors. This will have the effect of giving to ... each defendant two peremptory challenges to be dedicated to the member of the regular jury panel, with the remaining two to the alternates.

7 Transcript at 182.

Northwest argues that the trial court committed reversible error because it failed to recognize that it had discretion under § 1870 to grant additional peremptory challenges. *See John Long Trucking, Inc. v. Greear,* 421 F.2d 125, 127–28 (10th Cir.1970); *Globe Indem. Co. v. Stringer,* 190 F.2d 1017, 1018 (5th Cir.1951). We disagree. It is plain from the record that the court understood its discretion to give the parties more than the three challenges per side required by § 1870. In fact, as Northwest concedes, the court did exactly that later in the hearing. Northwest makes much of the fact that initially the court stated that it would be "illegal" to grant the defendants their request for twice the number of peremptory challenges allowed the plaintiffs. While this language was probably ill advised, we believe that the single comment does not render the final allocation of peremptory challenges reversible error. The context of the comment shows that the court did, in fact, recognize its discretion, and did, in fact, depart from the number of peremptory challenges specified in § 1870 and Rule 47(b).

regular jury be called and impanelled to sit as alternate jurors.... Each side is entitled to 1 peremptory challenge in addition to those otherwise allowed by law if 1 or 2 jurors are to be impanelled, 2 peremptory challenges if 3 or 4 alternate jurors are to be impanelled, and 3 peremptory challenges if 5 or 6 alternate jurors are to be impanelled. The additional peremptory challenges may be used against an alternate juror only....
Six alternates were impanelled in this case. An amendment to Rule 47(b), effective December 1, 1991, abolished the provision for peremptory challenges to alternate jurors.

### 3. Giving Erroneous Jury Instructions

Northwest's third legal argument on appeal is that it is entitled to a new trial because the judge gave the jury erroneous instructions. Northwest appeals instructions regarding McDonnell Douglas's right to assume that Northwest would obey the law, McDonnell Douglas's sophisticated user defense, and whether Northwest's alleged violation of FAA regulations was proper evidence of negligence.

We review jury instructions "as a whole to determine whether they adequately inform the jury of relevant considerations and provide a basis in law for the jury to reach its decision." *Beard v. Norwegian Caribbean Lines,* 900 F.2d 71, 72 (6th Cir. 1990). "A jury instruction which states the law with substantial accuracy and fairly submits the issues to the jury will not provide grounds for reversal." *Clarksville–Montgomery County Sch. Sys. v. United States Gypsum,* 925 F.2d 993, 1003 (6th Cir.1991). "A judgment may be reversed only if the instructions, viewed as a whole, were confusing, misleading, or prejudicial." *Beard,* 900 F.2d at 73.

The first instruction Northwest challenges is this:

> In evaluating Northwest Airlines' fourth and fifth claims [against McDonnell Douglas, asserting negligent manufacture and design] every person who exercises ordinary care [has] the right to assume that everyone else will perform his duty and obey the law. In the absence of a reasonable basis for thinking otherwise, it is not negligence for him to fail to anticipate an accident which can occur only as a result of a violation of law or duty by another person.

199 Transcript at 144. This instruction was taken from § 3.13 of California's Book of Approved Jury Instructions (BAJI). The district court determined that California law would apply to Northwest's products liability claims against McDonnell Douglas, but that Northwest's claims sounding in fraud would be governed by Michigan law. Order, Feb. 1, 1991.

Northwest objected to this instruction. Northwest's Final Comments and Objections to Court's Set of Jury Instructions, filed March 27, 1991, at 33. Northwest also requested that, if this instruction were given, the court should add a sentence stating: "However, if the violation of the duty, which is, essentially, negligence of another party, is reasonably anticipated or reasonably foreseeable, then there is no right to assume that others will perform their duty." *Ibid.*

On appeal, Northwest again disputes the use of the instruction. Northwest argues that "there is no right ... to assume good conduct if bad conduct may be reasonably anticipated, and certainly no such right where a person is actually aware of the likelihood of bad conduct," citing *Levy–Zentner Co. v. Southern Pacific Transp. Co.,* 74 Cal. App.3d 762, 142 Cal.Rptr. 1, 14 (1977), in which the California Court of Appeals held that a court's *refusal* to give an instruction based upon BAJI 3.13 was not reversible error. Northwest Br. at 58. Northwest contends that:

> it was widely known in the airline industry that pilots make mistakes and that human error in configuring airplanes for takeoffs is one of the most common such mistakes.... In fact, this is the reason Northwest purchased and MDC sold the CAWS takeoff warning.... MDC recognized that such mistakes were foreseeable.

Northwest Br. at 59. Therefore, Northwest concludes that giving BAJI 3.13 was an error.

McDonnell Douglas responds by citing *Whitton v. State,* 98 Cal.App.3d 235, 159 Cal.Rptr. 405, 410 (1979). In that case, the California appellate court considered whether it was error to *include* BAJI 3.13 when evidence indicated that the risk of negligent or unlawful behavior was foreseeable. The court stated: "If there is evidence on both sides of the question as to whether the conduct of a third person is or is not foreseeable, the jury instruction is correct. Its application or effect will depend on the finding of the jury as to whether the act of the third person should have been anticipated or foreseen." 159 Cal.Rptr. at 411–12. McDonnell Douglas argues that this instruction was cor-

rectly given, because there was a jury question about the foreseeability of the actions taken by Northwest's crew, including evidence that suggested the crew had deliberately pulled the circuit breaker that powered the aural warning system.

We hold that the district court did not err by including a version of BAJI 3.13 in the jury instructions. As in *Whitton*, "there is evidence on both sides of the question" of the foreseeability of Northwest's crew's actions. There were conflicting facts argued at trial regarding whether the circuit breaker failed because it was defective, or because the Northwest crew deliberately pulled it. The conduct at issue does not stop with whether the flaps and slats were properly positioned for takeoff, as Northwest appears to argue. It includes the question of whether the crew's alleged disabling of the warning system, and its apparent failure to execute the required checklist before takeoff, also were foreseeable to McDonnell Douglas.

Northwest's reliance on *Levy–Zentner* is misplaced. In that case, BAJI 3.13 was inappropriate, since *unrefuted* evidence demonstrated that the defendants there knew about the dangerous conduct of third parties, in that case itinerants who had "caused a fire about every other year" on defendant's property. *Levy–Zentner*, 142 Cal.Rptr. at 14. Therefore, it was not erroneous for the court to decline to give the instruction in that case. *Id.* at 15. Here, at best (for Northwest) the court could properly have decided either way, and therefore acted within its discretion.

■ The second instruction that Northwest challenges concerns McDonnell Douglas's "sophisticated user" defense. The court stated:

McDonnell Douglas asserts that Northwest Airlines was a sophisticated user of the aircraft.

A sophisticated user is one who, by virtue of its knowledge, skill, experience, and/or expertise, is reasonably or should be aware of risks in the use of the product.

If you find that McDonnell Douglas has proved that Northwest Airlines was a sophisticated user, you should consider that

fact, together with all of the other evidence, in deciding whether McDonnell Douglas was negligent in failing to warn or adequately warn about dangers in the aircraft that were obvious or known to Northwest Airlines because of its status as a sophisticated user.

199 Transcript at 146. The court read the instruction immediately after the instruction on Northwest's sixth claim, charging McDonnell Douglas with negligence in failing to give an adequate warning of the dangers associated with the aircraft.

Northwest argues on appeal, and argued in its objections to the jury instructions, that the instruction was erroneous because there is no support in California law for a "sophisticated user" defense. Northwest states that the district court incorrectly relied on *Fierro v. International Harvester Co.*, 127 Cal. App.3d 862, 179 Cal.Rptr. 923, 925 (1982), a case that discussed only the absence of a duty to warn of open and obvious defects, not any so-called "sophisticated user defense." Northwest also argues that *In re Related Asbestos Cases*, 543 F.Supp. 1142, 1151 (N.D.Cal.1982) "clearly states that the California courts have not adopted the sophisticated user defense." Northwest Br. at 60; Northwest's Final Comments and Objections to Court's Set of Jury Instructions at 39.

In the alternative, Northwest argues that the court should not apply any "sophisticated user defense" to McDonnell Douglas with regard to the asserted defects with the aural warning system, the circuit breaker, or the flight director. "Northwest's status as a commercial airline is insufficient to impute knowledge to Northwest on subjects about which it could not be expected to know in the face of incorrect information from MDC...." Northwest Br. at 61.

McDonnell Douglas responds that the "sophisticated user" defense is simply a form of the " 'open and obvious' defense for users with experience or knowledge beyond that of a layman...." McDonnell Douglas further states that the sophisticated user defense has been adopted in California, citing both *Fierro*, 179 Cal.Rptr. at 925, and *Asbestos Cases*, 543 F.Supp. at 1151. McDonnell Douglas Br. at 54.

Faced with these arguments, the district court determined that California law does allow a "sophisticated user" defense:

> In *In re Asbestos Cases,* 543 F.Supp. 1142, 1151 (N.D.Cal.1982), Chief Judge Peckham addressed this issue:
>
> > The California courts have not yet clearly embraced the sophisticated user doctrine. However, dictum in *Fierro* ..., a strict liability case, indicates that the defense is taking hold in California.... Although the comments in *Fierro* were merely dicta, the sophisticated user defense discussed therein is so similar in principle to the defense of superseding cause, which California does allow, that we believe the highest California court would permit the defense, provided, once again, that the plaintiffs were permitted to negate the defense by showing that the sophisticated employer's misuse of the product was foreseeable, and so did not absolve the defendants of liability for failure of the duty to warn....
>
> This court can find no reason to disagree with this analysis. Since MDC has raised this defense in the Joint Final Pretrial Order ... and inasmuch as California law recognizes or would recognize the sophisticated user defense, Northwest's ... objection will be rejected.

Order, Feb. 19, 1991, at 2–3.

We note that subsequent California cases have not clarified the status of the sophisticated user defense. In *Macias v. California,* 10 Cal.4th 844, 42 Cal.Rptr.2d 592, 897 P.2d 530 (1995), the California Supreme Court determined that "fundamental issues of legislative and public policy" involved in that case are "dispositive and thus render ... abstract doctrines [including the "sophisticated user" defense] largely superfluous." 10 Cal.4th at 853, 42 Cal.Rptr.2d 592, 897 P.2d 530. Furthermore, both *Macias* and *Huynh v. Ingersoll–Rand,* 16 Cal.App.4th 825, 20 Cal. Rptr.2d 296, 301 (1993), are distinguishable from this case because they consider the extent to which a manufacturer could rely on an *intermediary* to pass along a warning to the ultimate consumer. Even if these decisions had been available when this case was heard, we observe that their different factual settings mean that they do not provide us much guidance on how to apply California law to Northwest's charge of error.

We do believe, as McDonnell Douglas argues in its brief, that California courts have not rejected the dictum in *Asbestos Cases* that California courts would allow the sophisticated user defense, provided that the plaintiffs "were permitted to negate the defense by showing that the ... misuse of the product was foreseeable." *Asbestos Cases,* 543 F.Supp. at 1151; McDonnell Douglas Br. at 54 n. 74. Additionally, the actual instruction simply directed the jury, if they found Northwest to be a sophisticated user, to "consider that fact, together with all of the other evidence, in deciding whether McDonnell Douglas was negligent in failing to warn...." 199 Transcript at 146. This instruction therefore treats Northwest's "sophistication" as one factor among many that the jury may use to determine negligence—it does not suggest that Northwest's sophistication absolutely bars recovery from McDonnell Douglas.

In short, we find that *Asbestos Cases* supports the use of a sophisticated user defense in California tort law. Although not binding precedent upon California courts, we note that the relevant dictum has not been modified or even questioned by those courts. We cannot find, therefore, that this instruction was a misstatement of the law, and we do not see that it was so "confusing, misleading, or prejudicial," as to justify reversal. *Beard,* 900 F.2d at 73.[14]

■ The final instruction that Northwest challenges relates to the evidentiary significance of Northwest's alleged violation of FAA regulations. The court instructed:

> McDonnell Douglas' fourth claim is that Northwest Airlines violated one or more of

---

14. Furthermore, as McDonnell Douglas argues, the same elements in Northwest's negligent failure to warn claim were repeated in its strict liability failure to warn claim, but without the instruction on the sophisticated user defense.

*See* 199 Transcript at 142–46. The jury rejected the strict liability claim, so it appears that any error from including an instruction on this admittedly uncertain aspect of California tort law was harmless.

the following federal regulations [listing 9 FAA regulations]. If you find that Northwest Airlines violated one or more of these regulations before or at the time of the accident, such acts constitute evidence of negligence which you should consider, together with all of the other evidence, in deciding whether it was negligent and whether such negligence was a proximate cause of the accident.

199 Transcript at 135–36. The court had previously determined that Michigan law applied to this issue. *In re Air Crash Disaster at Detroit Metro. Airport,* 750 F.Supp. 793, 795 (E.D.Mich.1989).

Northwest argues that this instruction was erroneous because McDonnell Douglas failed to provide expert testimony on whether Northwest violated six of these FAA regulations, each of which concerned what Northwest calls "maintenance." [15] Northwest states that this lapse is critical, because "the existence of a violation would not be obvious to a lay person.... The jury could have found that Northwest violated the maintenance FARs [FAA regulations] and could have improperly based its finding of willful misconduct by management on this violation." Northwest's Br. at 62. Northwest analogizes the analytical challenge facing the jury here to those in *Beattie v. Firnschild,* 152 Mich.App. 785, 394 N.W.2d 107, 110 (1986) (requiring expert testimony to establish attorney's violation of professional responsibility code), and *Bivens v. Detroit Osteopathic Hosp.,* 77 Mich.App. 478, 258 N.W.2d 527, 532 (1977) (requiring expert testimony to establish medical malpractice), *rev'd on other grounds,* 403 Mich. 820, 282 N.W.2d 926 (1978).

McDonnell Douglas responds that the issue of whether Northwest followed the maintenance regulations is not one that the jury needs the help of an expert to resolve. McDonnell Douglas notes that "[e]very day, jurors throughout this country are asked—

indeed, expected—to decide, without expert assistance, whether a party violated federal laws or regulations," citing as examples *Farmland Indus. v. Frazier–Parrott Commodities, Inc.,* 871 F.2d 1402, 1409 (8th Cir. 1989) (CFTC regulations); *Stissi v. Interstate & Ocean Transp. Co.,* 765 F.2d 370, 376 (2d Cir.1985) (federal navigation rules); *Payne v. A.O. Smith Corp.,* 627 F.Supp. 226, 228 (S.D.Ohio 1985) (Consumer Product Safety Act).

McDonnell Douglas adds that "in the Sixth Circuit, expert testimony as to what constitutes a violation of law is improper," citing *Payne,* 627 F.Supp. at 228; *Molecular Technology Corp. v. Valentine,* 925 F.2d 910 (6th Cir.1991); *Torres v. County of Oakland,* 758 F.2d 147, 150 (6th Cir.1985). However, these cases appear to stand merely for the proposition that it is improper for an expert witness to testify concerning legal requirements, as this "invade[s] the province of the court to determine the applicable law and to instruct the jury as to that law." *Torres,* 758 F.2d at 150 (internal quotation omitted).

In any case, McDonnell Douglas argues that it produced evidence that Northwest violated FAA maintenance regulations, and in addition produced "substantial evidence" that Northwest violated the three other FAA regulations listed in the instruction (and not challenged on appeal). McDonnell Douglas points out that Michigan law does not recognize negligence *per se* for violations of regulations, as reflected in the instruction. It does, however, allow a jury to consider the violation of regulations as *evidence* of negligence, rather than negligence itself.

Again, we agree with McDonnell Douglas and the trial court. There is no indication that Michigan law requires expert testimony before a jury can regard an airline's violation of federal regulations as evidence of negligence. This is not a case where "existing custom and practice in the profession ... define[ ] the standard of liability applicable to

---

**15.** The regulations listed in the jury instruction were: § 121.315, cockpit check procedure; § 121.533, responsibility for operational control: domestic air carriers; § 121.542, flight crew member duties; § 121.363, responsibility for airworthiness; § 121.367, maintenance, preventative maintenance, and alterations programs; § 121.373, continuing analysis and surveillance; § 121.701, maintenance log: aircraft; § 121.703, mechanical reliability reports; and § 121.709, airworthiness release or aircraft log entry. Northwest contends that §§ 121.363, 121.367, 121.373, 121.701, 121.703, and 121.709 are "maintenance FARs."

the particular professional conduct in question." *Stiver v. Parker,* 975 F.2d 261, 273 (6th Cir.1992) (discussing Michigan's expert testimony requirement for medical and legal malpractice). Even in the legal and medical malpractice areas, the need for expert testimony is "not an absolute principle of law devoid of exceptions." *Beattie,* 394 N.W.2d at 110. Under Michigan law, if a violation of professional standards is obvious, expert testimony is unnecessary.

Here, the court spelled out each of the regulations for the jury, and the jury had copies of the regulations during deliberations. 199 Transcript at 36. During trial, both Northwest and McDonnell Douglas provided a rich array of facts and experts, and one might conclude that, by the end of it, the jury had a substantial amount of "expertise" of its own. At the very least, the jury, based upon ordinary everyday experience and their presence for eighteen months at trial, could reasonably have found that Northwest's crew failed to execute the pre-flight cockpit checklist properly, and deliberately pulled the CAWS circuit breaker. Both of these acts would clearly violate federal regulations.

· For these reasons, we do not believe that any of Northwest's challenges to the jury instructions have merit. The court gave the instructions after each party "presented voluminous proposed instructions, objections to opposing instructions, alternative instructions, and three sets · of objections to the various drafts of the jury charge...." Order, Oct. 1, 1991, at 31. "A jury instruction which states the law with substantial accuracy and fairly submits the issues to the jury will not provide ground for reversal," *Clarksville–Montgomery County Sch. Sys.,* 925 F.2d at 1003. We hold that Judge Cook's instructions did so.

**4. Not Ordering a New Trial Based On Counsel's Comments During Closing Argument**

■ Northwest's final contention of law on appeal is that improper vouching by McDonnell Douglas's counsel during closing argument requires a new trial. Northwest asserts that vouching permeated the entire closing argument, and, given the 18–month duration of the trial, "the jury probably relied heavily on counsel's recapitulation of the evidence...." Northwest Br. at 65.

■ Misconduct by an attorney that results in prejudice may serve as a basis for a new trial. *City of Cleveland v. Peter Kiewit Sons' Co.,* 624 F.2d 749, 756 (6th Cir.1980). The burden of showing prejudice rests with the party seeking the new trial, and district courts have broad discretion in deciding whether to grant a motion for a new trial. *Allied Chem. Corp. v. Daiflon, Inc.,* 449 U.S. 33, 36, 101 S.Ct. 188, 190, 66 L.Ed.2d 193 (1980).

Northwest contends that McDonnell Douglas's counsel committed several acts of vouching. According to Northwest, he first vouched by stating:

I say to you as sincerely as I can, that if there were any responsibility on McDonnell Douglas' part for this terrible accident, we would stand up and accept it. We do not stand up and accept it because it is not the truth.

196 Transcript at 124. Counsel made this statement at the end of McDonnell Douglas's initial closing argument.

McDonnell Douglas's second alleged instance of vouching occurred during its rebuttal argument. Counsel stated:

Unlike the part of the transcript read to you yesterday by Mr. Dubuc, the fact is that Mr. Grigg testified that Mr. Edelman, the Northwest captain, told him that Republic pilots used to pull P–40 circuit breakers to silence unwanted warnings. *That's the truth. Take it from me.* And Edelman was not brought to contradict that.

199 Transcript at 59 (emphasis added). Northwest also indicates other occurrences of alleged vouching, where McDonnell Douglas's counsel expressed his opinion about the evidence.[16]

---

16. McDonnell Douglas's counsel referred to Northwest's ticketing evidence, by telling the jury that it had to find Northwest committed "wanton and willful negligence" in order to compensate fully those passengers traveling on limited liabili-

McDonnell Douglas notes that the parties had agreed before closing arguments to hold objections until after the argument, unless a comment was egregious.[17] McDonnell Douglas states that Northwest did not object to the first comment—"stand up and accept it"—until the morning after its own closing, two days later. 199 Transcript at 38. At that time, Northwest also objected in a general way to McDonnell Douglas's counsel's use of "other formulations where, in effect, he is vouching for the client, his belief in the client or else is making statements as to his belief as to the record." *Ibid.*

The court ruled that this objection was untimely. 199 Transcript at 40. The court ruled that, if the objection had been timely, it lacked merit, because the comments "do not, in the judgment of this Court, vouch for the veracity or the actions of his client." 199 Transcript at 41. However, in the court's Order denying Northwest's motion for a new trial, the court determined that the "stand up and accept it" comment *was* improper, but was "neither so egregious nor inflammatory that [it] could have, or did, prejudice Northwest or adversely affect the ability of the jury to render a fair and considered verdict on the issues in controversy." Order, October 1, 1991, at 27.

Northwest made a timely objection to the "take it from me" comment. The court sustained Northwest's objection, 199 Transcript at 17, and gave a general cautionary instruction.[18] Nevertheless, Northwest argues that this instruction was insufficient to "cure the prejudice," as it was not specifically directed to McDonnell Douglas's counsel's comments.

■■■ We agree with the district court that these instances of arguably inappropriate commentary did not unfairly prejudice Northwest. We note at the outset that each side had four hours of closing argument, and one hour of rebuttal argument, before the jury deliberated.

In determining whether 'there is a reasonable probability that the verdict of a jury has been influenced' by improper conduct, warranting that the verdict be set aside, a court must examine, on a case-by-case basis, the totality of the circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, the manner in which the parties and the court treated the comments, the strength of the case (e.g.[,] whether it is a close case), and the verdict itself.

*City of Cleveland v. Peter Kiewit Sons' Co.,* 624 F.2d 749, 756 (6th Cir.1980). Looking at the big picture, we find that the comments were a small part of counsels' arguments, although they certainly were relevant to the issues Northwest raised against McDonnell Douglas. The court responded as requested when Northwest made a timely objection to the "take it from me" statement by giving a cautionary instruction. The jury took sixteen days to deliberate (with five intervening weekends), which hardly indicates an inflamed rush to judgment.[19] Whether or not

---

ty tickets. This point will be discussed below at pp. 66 to 83.

**17.** The court had stated:

Incidently, speaking of objections, I would hope that there would be no objections during the course of a closing argument. Unless the comment is egregious, I would hope that you refrain from doing that, for reasons that are obvious to all of you. I will not make any further comment on that.

195 Transcript at 30. It is not clear to us whether the court meant to require parties to object to comments made in closing at the end of each side's argument, or at the end of all the arguments. Arguably, either interpretation is possible, and we will give Northwest the benefit of the doubt on the issue.

**18.** After McDonnell Douglas's rebuttal argument, but before Northwest's rebuttal, the court instructed:

Ladies and gentlemen, before you proceed, let me remind you that during the closing arguments, please remember that an attorney does not vouch for the conduct of the actions of his client. He stands here primarily and solely as the representative—that is, the legal representative of the client—and will seek to persuade you that the evidence which has been produced during the course of this trial has produced enough evidence to support a verdict in favor of his client. And that is the responsibility of counsel as they present the closing arguments.

199 Transcript at 43.

**19.** Jury instructions were given on April 4, 1991. The jury returned its verdict on May 8.

Northwest's first objection was timely, Northwest has not sustained its heavy burden of showing that it deserves a new trial based on a few words in a long closing argument.

## B

■■■ We now address Northwest's claims that it is entitled to a new trial because the district court erred by excluding various items of evidence from the jury's consideration. We note at the outset that evidentiary rulings are left to the discretion of the trial judge. Especially in a case of this length and magnitude, the trial judge understands each item of evidence and its place in the web of other evidence in a way that no appellate court can. Realizing this, we look only for abuses of discretion. *Conklin v. Lovely*, 834 F.2d 543, 551 (6th Cir. 1987). If there has been an abuse of discretion, we still will not reverse a ruling or order a new trial absent actual prejudice. There is no prejudice from the wrongful exclusion of evidence "if other substantially equivalent evidence of the same facts [was] admitted into evidence." *Leonard v. Uniroyal, Inc.*, 765 F.2d 560, 567 (6th Cir.1985), quoting *Crown Cork & Seal Co. v. Morton Pharmaceuticals, Inc.*, 417 F.2d 921, 926–27 (6th Cir.1969). Nor is there prejudice if the absence of the evidence had no effect on the final result of the trial. *Collum v. Butler*, 421 F.2d 1257, 1260 (7th Cir.1970).

### 1. Striking the Testimony of the Plaintiffs' Experts

■■■ Northwest contends that it is entitled to a new trial because the court struck expert opinion testimony offered by the plaintiffs after the dismissal of the plaintiffs' case against McDonnell Douglas. Northwest argues that the court's order was without legal basis, and that it violated the pre-trial understanding of the parties.

The settlement between Northwest and the eighty plaintiffs who presented evidence against McDonnell Douglas was partly the result of the intervention of Judge Louis Bechtle. Chief Justice Rehnquist appointed Judge Bechtle to facilitate settlement of aspects of the case. Judge Bechtle organized the settlement between Northwest and the plaintiffs and set the structure of the trial that ensued: Northwest and the plaintiffs would each proceed against McDonnell Douglas in a single trial.

Northwest now contends that, given the context of the settlement, it relied on the plaintiffs to introduce evidence about the plane's aerodynamics at stall, the CAWS's reliability, the circuit breaker's reliability, and McDonnell Douglas's compliance with FAA regulations. Northwest Br. at 27. Northwest was prepared to offer its own testimony as to these matters, but it claims to have relied on the plaintiffs' testimony to supplement and to "fill gaps." Of the plaintiffs' many witnesses, three people gave opinions on these issues: Donald Kennedy, Ira Rimson, and William Mazer.[20]

When the plaintiffs settled with McDonnell Douglas, the district court granted McDonnell Douglas's motion to strike the plaintiffs' expert testimony (the plaintiffs' factual testimony was allowed to remain). Over Northwest's objection, the court held that "Northwest's case, as outlined in the joint final pretrial order must proceed on the testimony of its own witnesses." Order, October 1, 1990, at 5. Northwest unsuccessfully sought reconsideration, Order, December 6, 1990, and now claims that the court erred in such a way as to require a new trial.

We do not believe that the district court's ruling was an error. Northwest characterizes the court's order striking the evidence as a finding that the evidence was not relevant. Northwest contends that this is an error because the evidence meets the formal definition of relevance. Federal Rule of Evidence 401 (it "tend[s] to make the existence of any fact that is of consequence to the determination of the action more probable or less

---

**20.** Northwest originally challenged the court's decision to strike the testimony of another of plaintiffs' witnesses, Dale Calkins. Northwest Brief at 24. McDonnell Douglas correctly points out that Northwest did not object to the striking of this testimony at trial. McDonnell Douglas Br. at 23. Nor does Northwest list this testimony among those important to it at page 27 of its brief.

probable...."). The court's order, however, is considerably more complex than Northwest's interpretation of it. The court based its order excluding the expert opinion testimony on its general "authority to control the number of expert witnesses." October 1, 1990 Order at 5. It also stated that use of the experts in addition to Northwest's own experts would be cumulative and repetitive under Fed.R.Evid. 403. *Ibid.* Given these statements, we do not regard the court's order as one striking the testimony as irrelevant. Instead, we see the court's order as an administrative decision that Northwest had enough experts of its own that could speak to the critical facts—and that giving Northwest a double helping of experts would be unfair. We believe that, in the context of this case, such an order was perfectly appropriate.

Northwest claims that, regardless of the court's power to control the number of experts, the district court's order reverses the earlier "decision" by Judge Bechtle that Northwest and the plaintiffs should get the benefit of each other's evidence. Northwest contends that part of the consideration of settlement was the promised ability to use the plaintiffs' evidence, and that taking away this ability in the middle of trial was unfair.

There is nothing in the record, however, that suggests Judge Bechtle told Northwest that signing the settlement gave them the legal right to use the plaintiffs' evidence against McDonnell Douglas. The settlement merely set up a *structure* in which such reliance was possible. The most Northwest can now claim is that it prepared for trial expecting to proceed hand-in-hand with the plaintiffs, and was caught by surprise when the plaintiffs settled. The district court did not err in rejecting this argument. First, it is highly unlikely that a settlement between the plaintiffs and McDonnell Douglas was unforeseeable (all other plaintiffs had settled all other claims). Second, a court has no obligation to correct a party's own tactical mistakes.

■ In the alternative, Northwest contends that, even if the court did not err in striking the testimony, it erred by refusing to let Northwest recall the plaintiffs' expert witnesses during Northwest's own case-in-chief.

Northwest claims that it was entitled to call the plaintiff's experts because, in the joint final pretrial order, it "reserved the right" to call other parties' witnesses. Northwest List of Trial Witnesses at 1. Northwest finds support in *Kendra Oil & Gas, Inc. v. Homco, Ltd.*, 879 F.2d 240, 242–43 (7th Cir.1989) (there is no legal difference between reserving the right to call another party's witnesses and listing the names of each one of those witnesses separately).

■ *Kendra* may create a good default rule to interpret the parties' understandings of a pretrial agreement on possible witnesses. When circumstances warrant a departure, however, a court is free in a particular litigation to require the plaintiffs to reveal witnesses with a greater degree of specificity. In this case, the district court told the parties that they had to disclose the actual name of each expert witness, or risk losing the ability to call him or her at trial. Order, October 1, 1990, at 4 (district court states that it gave the parties warnings to this effect).

■ Even if the court's warnings were insufficient, a court is free to exclude *any* expert testimony, including the testimony of an announced expert, if the testimony is cumulative or redundant under Fed.R.Evid. 403. The district court below made such a finding for "most" of the expert testimony. Order, October 1, 1990, at 5. Our own examination of the voluminous record supports that conclusion. Northwest put twenty-four expert witnesses on the stand. The testimony of these experts, taken as a whole, covers every part of the testimony of Kennedy, Rimson, and Mazer. As the court said in *Kendra:* nothing "suggests that [the expert] would have added to these interpretations a new angle or argument, as opposed to the refrain 'me too'." 879 F.2d at 243. For these reasons, the district court did not abuse its discretion by denying Northwest's motion to re-introduce the stricken opinions.

**2. Precluding Testimony by Drs. Kohlman and Kennedy**

■ Northwest claims that the district court erred in refusing to allow Northwest to

take "rebuttal" testimony from two expert witnesses concerning McDonnell Douglas's alleged non-compliance with FAA regulations. In its case-in-chief, McDonnell Douglas offered evidence that the design of the aircraft and the safety components conformed with FAA regulations. (This evidence contradicted part of the stricken testimony of plaintiffs' experts, described above.) In response, Northwest offered the testimony of its own experts. These experts described the substance of the FAA requirements and opined that the plane did not conform. The experts, however, were not allowed to state the ultimate conclusion that McDonnell Douglas *violated* the regulations.

The district court held that Northwest was barred from eliciting this last conclusion from its experts because of the "Brumby Rule." The "Brumby Rule," so called in reference to witness Ralph Brumby whose testimony earlier in the trial had been restricted, 65 Transcript at 158–60, was a rule of the case developed by the district court with the general agreement of both parties. In order to eliminate surprises at trial, the rule precluded expert testimony about opinions not formed at the time of the expert's deposition. An opinion that was formed, but for some reason not disclosed at deposition, was not precluded. Order, June 6, 1990, at 2 n. 3; 103 Transcript at 84–85. Northwest does not dispute that the relevant experts had not formed an opinion about whether the plane violated the FAA regulations at the time of the experts' deposition.

Instead, Northwest argues that the court should have allowed it to offer the experts' opinions as "rebuttal" evidence, a category of evidence that both parties agree can include new opinions. We do not believe the district court abused its discretion in deciding that Kohlman's and Kennedy's opinions were not proper rebuttal testimony. Rebuttal testimony is responsive to new information by the other party. The testimony of McDonnell Douglas that its plane complied with FAA regulations was not "new" to Northwest. In fact, Northwest had raised such issues before trial, Scheduling Order, June 6, 1989, ¶¶ 36–37, 80–82, and included information about the FAA regulations in its trial exhibits. *See*

Trial Ex.2009 (FAA Certification Summary). The district court correctly decided that Northwest could not circumvent the Brumby Rule merely by sticking the label "rebuttal" on a neglected part of its affirmative case.

### 3. Excluding Evidence of Northwest's Post–Accident Rewiring of the Central Aural Warning System

■ Northwest claims that the district court erred in excluding evidence relating to its post-accident rewiring of the plane's Central Aural Warning System ("CAWS"). After the accident, Northwest rewired all of its fleet of MD–80 aircraft (the model that crashed) so that the CAWS Fail Light would illuminate upon loss of input power. Northwest sought to introduce the fact of this rewiring as circumstantial evidence that the system had been unsafe.

The district court granted McDonnell Douglas's Motion *in Limine* No. 3 and excluded the evidence. The court reasoned that Northwest's post-accident rewiring of the CAWS was inadmissible under Fed. R.Evid. 407 as a subsequent remedial measure offered to prove culpable conduct of a tortfeasor. Order, October 30, 1989, at 11.

According to Northwest, the court erred in excluding the evidence of the rewiring because it was relevant and not excludable under Rule 407. Northwest contends that its rewiring evidence was not precluded under Rule 407 "because [the Rule] does not apply to subsequent measures taken by a third party." Northwest Br. at 51. Inasmuch as Northwest is not a third party to this suit, its claim appears to be that Rule 407 does not bar evidence of subsequent remedial measures taken by a party other than the one with primary responsibility for the subject of the remedial measures (a "non-responsible party"). Northwest also argues that even if the court's Rule 407 ruling was correct, later developments at trial opened the door to admission of the CAWS rewiring.

■ We agree with Northwest that its rewiring of the CAWS fell within the federal rules' broad definition of relevance. Fed. R.Evid. 401. Under Rule 401, evidence is relevant if it has "any tendency to make the

existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Whether the CAWS was improperly wired was an issue of consequence in this case. Northwest's rewiring of the CAWS is circumstantial evidence, if only of a weak and suspect sort, that the CAWS as it existed at the time of the accident was not foolproof.

■ However, it is not clear that the court erred by excluding the fact of the rewiring under Rule 407 as a subsequent remedial measure. There is nothing in the text of Rule 407 that limits its application to measures by a "responsible" party—i.e., measures by a party against whom the evidence is offered. The Rule provides,

> When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.

Fed.R.Evid. 407. Although the Rule specifically removes from its reach evidence of remedial measures offered for purposes other than to prove negligence or culpable conduct, it nowhere embraces the limitation Northwest urges. By its terms, the Rule seems to exclude evidence of remedial measures regardless of who undertook them.

It is true that exceptions to the Rule have developed. *E.g., Werner v. Upjohn Co., Inc.,* 628 F.2d 848, 855 (4th Cir.1980), *cert. denied,* 449 U.S. 1080, 101 S.Ct. 862, 66 L.Ed.2d 804 (1981). Northwest cites several cases in which courts declined to exclude evidence of subsequent remedial measures. Some cases contain language saying that "Rule 407 applies only to subsequent remedial measures taken voluntarily *by the defendant." Raymond v. Raymond Corp.,* 938 F.2d 1518, 1524 (1st Cir.1991). *Accord Middleton v. Harris Press & Shear, Inc.,* 796 F.2d 747, 751 (5th Cir.1986). In each of these cases, however,

the remedial measure was taken, not by a plaintiff, but by someone who was not a party to the suit. *E.g., Raymond,* 938 F.2d at 1524; *O'Dell v. Hercules Inc.,* 904 F.2d 1194, 1203–04 (8th Cir.1990); *Middleton,* 796 F.2d at 751–52. There is no direct support for Northwest's argument that it should have been able to introduce evidence of its own voluntary remedial measures to prove the culpability of an adversary.

Courts have been wary to restrict the scope of Rule 407. "[W]e should not be too quick to read new exceptions into the rule because by doing so there is a danger of subverting the policy underlying the rule." *Werner,* 628 F.2d at 856. In this case, there is neither clear textual authority nor legislative history supporting an exception. *See Bradley v. Austin,* 841 F.2d 1288, 1293 (6th Cir.1988) (unambiguous language in a statute is conclusive of its meaning).

■ One might argue that the purpose of Rule 407, at least as that purpose is commonly understood, is not directly served by the application of the rule to the present circumstances. Allowing evidence of subsequent remedial measures by someone suing the manufacturer of an allegedly faulty product does not *deter* subsequent safety precautions. In fact, allowing such evidence might *encourage* subsequent precautions, as the value of a subsequent remedial measure to the buyer of the faulty product would include its safety effect *and* its tactical advantage during litigation.

However, it would be wrong to construe the function of Rule 407 so narrowly. Independent of its effect on safety upgrades by alleged tortfeasors, the rule bars a class of evidence that is very poor proof of negligence or defectiveness. 2 Weinstein's Evidence § 407, 13–14 (finding in the unreliability of such evidence a primary purpose of the rule). There is nothing that makes evidence of a subsequent remedial measure by a plaintiff (or someone in the position of a plaintiff, like Northwest) better proof of culpable conduct than evidence of a remedial measure by a defendant. Indeed, measures taken by a plaintiff—especially one contemplating litigation—strike us as *more* dubious because of

the possibility that the plaintiff is only "repairing" an item in order to create helpful evidence.

We believe that the district court's interpretation of Rule 407 was correct and that the rule can encompass situations like the one presented here. The text of the rule is unqualified, and there is precedent cautioning us from creating exceptions. Furthermore, although applying the rule to measures taken by plaintiffs does not serve the rule's purpose to encourage safety precautions, it does serve the rule's purpose of excluding inherently unreliable evidence. Therefore, we hold that the district court did not err by excluding the evidence of the CAWS rewiring.

■ Northwest's argument that later developments at trial opened the door to admission of the CAWS rewiring evidence is also unpersuasive. Northwest contends that MDC opened the door in its cross-examination of Northwest witness Rodney Peters. Our review of the record indicates that while McDonnell Douglas examined Peters about Northwest's "fleet campaign" to remove and replace all CAWS circuit breakers from its MD–80s, it did not question Peters about the rewiring of the CAWS. Northwest argues that the replacement of the circuit breakers was nonetheless sufficiently related to the rewiring of the CAWS to open the door to the use of the CAWS rewiring evidence. In our view, however, the replacement of the breakers and the rewiring of the CAWS to warn the crew when the system is not receiving any power are not so related that McDonnell Douglas's examination of Peters on the former opens the door to Northwest's examination of him on the latter. Therefore, we agree with the district court that McDonnell Douglas did not open the door to admission of Northwest's rewiring of the CAWS.[21]

■ We note that, even if the exclusion of the rewiring evidence was an error, the error was harmless. The parties stipulated into evidence the feasibility of rewiring the CAWS Fail Light. 199 Transcript 130–32 (jury instructions). Furthermore, the court permitted Northwest to introduce factual and expert opinion testimony critical of McDonnell Douglas's wiring scheme. See Northwest Br. at 10 (summarizing).

### 4. Excluding Evidence that the Flight Director was Defective

■ Northwest claims that the court erred in excluding from evidence Exhibits 1106, 1107, 1123–29, and 1138, which related to the Honeywell flight directors used on MD–83, MD–87, and MD–88 aircraft. According to Northwest, the court erred in excluding these exhibits because they were relevant to its case and not otherwise inadmissible.

The court granted in part MDC's Motion *in Limine* No. 8 and excluded the exhibits as irrelevant, unduly prejudicial, and, except as to Exhibit 1126, concerned with subsequent remedial measures. Order, October 30, 1990, at 12–13. The court held that the exhibits were irrelevant under Rule 401, because they related to different model flight directors used on heavier planes with different engines. For much the same reason, the court excluded the exhibits on grounds that they would confuse the jury and result in an unwarranted expenditure of time, under Rule 403. Furthermore, the court held that the exhibits (except for Exhibit 1126) were inadmissible under Rule 407 on grounds that "remedial measures taken before an accident are excludable for the same policy considerations involved in a standard Rule 407 ruling." *Ibid.*

---

21. Although the court did not exclude the evidence of Northwest's rewiring the CAWS under Rule 403, we believe that exclusion of this evidence may alternatively be affirmed under that Rule. Rule 403 provides that "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury...." In our view, the danger of unfair prejudice from this evidence was great—especially because the repairs in question were made by a non-responsible party in whose interest it was to minimize its liability and maximize the liability of its codefendant—and substantially outweighed the minimal probative worth of the evidence. *See Bauman v. Volkswagenwerk Aktiengesellschaft*, 621 F.2d 230, 233 (6th Cir. 1980) (noting extent of prejudice caused by evidence of remedial measures).

In disagreement with the district court's holding, we believe that the exhibits at issue have at least minimal relevance. Although many of the exhibits related to different and newer models of flight directors than the model aboard flight 255, what the parties call the "control laws," or computer program, for the takeoff mode of all the flight directors were identical. 177 Transcript at 57. The exhibits lent at least some support to Northwest's claim that the flight director was defective.

Nor do we agree with the district court that Rule 407 bars the exhibits' admission. Rule 407 bars the admission of evidence of remedial measures taken after an event that would have made the event less likely to occur. Fed.R.Evid. 407. Here, however, the evidence was of measures taken *after* the design of a product but *before* the accident. Inasmuch as the exhibits related to pre-accident changes to the flight director, they fell outside the reach of Rule 407. *See e.g., Cates v. Sears, Roebuck & Co.*, 928 F.2d 679, 685–86 (5th Cir.1991); *Chase v. General Motors Corp.*, 856 F.2d 17, 21–22 (4th Cir.1988); 23 Charles A. Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure § 5283 (1980). *Contra Kelly v. Crown Equip. Co.*, 970 F.2d 1273, 1277 (3d Cir.1992) (excluding evidence of post-design, pre-accident remedial measure under Rule 407 but acknowledging that this holding contradicted the text of the rule).

Moreover, Rule 407 does not preclude evidence of subsequent measures offered for purposes of impeachment. Fed.R.Evid. 407; *see Patrick v. South Cent. Bell Tel. Co.*, 641 F.2d 1192, 1196–97 (6th Cir.1980). McDonnell Douglas's flight director expert, Jean-Jacques LeBlond, testified that the flight director was not defective and represented the state of the art, 76 Transcript at 56–57, and that there was no reason for McDonnell Douglas to advise operators about any "error" in the control laws operating immediately after takeoff, 79 Transcript at 72. In our view, Northwest was entitled to impeach LeBlond's testimony by showing that McDonnell Douglas, in later models, modified the design of the flight director aboard Flight 255 to correct deficiencies. *See Muzyka v. Remington Arms Co., Inc.*, 774 F.2d 1309, 1313–14 (5th Cir.1985) (originally excluded evidence of post-accident design change should have been admitted for impeachment purposes once the nature of the evidence presented by defendant manufacturer became apparent).

In the final analysis, however, we cannot conclude that the district court abused its discretion in excluding the exhibits under Rule 403 because their probative value was substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. Though not irrelevant, the exhibits in question were of marginal probative value, because they related to different model flight directors used on heavier planes with different engines. The exhibits would have complicated the proceedings, and could easily have confused the jury.

■ Even if we were to conclude that the court erred in excluding the exhibits under Rule 403, we could not say that the exclusion resulted in substantial injustice. Fed. R.Civ.P. 61. The record contains other evidence criticizing the design of the flight director. *E.g.*, 175 Transcript at 148–50 (expert testimony of lag between the plane's actual situation and flight director display); 78 Transcript at 37–39 (flight director had "predictive phase" immediately after takeoff in which the display did not conform to the plane's real position). We are satisfied that the admission of the exhibits in dispute would not have changed the outcome of this case.

### 5. Excluding an Internal Memorandum from McDonnell Douglas

■ Northwest claims that the court erred in excluding Exhibit 297, an internal memorandum from McDonnell Douglas dated two months after the crash. The short memorandum says that McDonnell Douglas recommended to the buyers of DC–10 planes that they should perform a "takeoff warning system check" prior to takeoff. The memorandum says that this recommendation was made in response to "the Chicago Accident"—a reference to the crash on takeoff of an American Airlines DC–10 in Chicago in 1979. The memorandum also says that a "takeoff warning system check" was not rec-

ommended to buyers of MD–80 planes because the CAWS Fail Light should catch similar problems.

The district court excluded the exhibit on two grounds. We agree with Northwest that one reason given by the court—that the memorandum, because it mentioned the Chicago accident, was more prejudicial than probative under Fed.R.Evid. 403—was improper. It may be true that the jury would have been swayed unfairly by the fact that another McDonnell Douglas plane crashed on takeoff. It may also be true that the fact that a "takeoff warning systems check" was not recommended is of little probative value—both because other systems checks were recommended and not performed by the Crew, and because there was evidence that the Crew pulled the circuit breaker connected to the CAWS. However, the district court did not consider the possibility that the memorandum could be redacted. We find this a minor error.

The error made no difference in the case, however. First, the court's other reason for excluding the exhibit is legitimate: Rule 407. The memorandum, written shortly after the crash, explains why the additional check was not recommended for the MD–80 model. It is obvious that the memorandum is part of a discussion about whether McDonnell Douglas should recommend the check in the future—and such a change in policy is a subsequent remedial measure within the meaning of Fed.R.Evid. 407. *Hall v. American Steamship Co.*, 688 F.2d 1062, 1066 (6th Cir.1982) (steamship's choice to follow new safety policy after an accident not admissible evidence of negligence under Rule 407). Second, the probative value of the memorandum, as mentioned above, is minimal. Even if one of the precautions neglected by the flight crew was not necessary, others certainly were. Our review of the record indicates that the neglect of these other, far more important, precautions constituted the heart of McDonnell Douglas's case, and the crux of the jury's verdict.

**6. Precluding Cross–Examination of Capt. Hawkins Regarding an Old Accident**

McDonnell Douglas called Capt. Hawkins as a "human factors" expert to testify about the mistakes made by the crew. Northwest sought to impeach Capt. Hawkins with evidence of the 1953 crash of plane he piloted in the Netherlands, in which two people were killed and many injured. Northwest claims that the district court's pre-trial order forbidding questioning about this incident violated its right to cross-examine Capt. Hawkins. *See Sperberg v. Goodyear Tire & Rubber Co.*, 519 F.2d 708, 711 (6th Cir.), *cert. denied*, 423 U.S. 987, 96 S.Ct. 395, 46 L.Ed.2d 303 (1975) (right to "meaningful inquiry which will disclose to the jury all possible facts upon which the jury may legitimately draw to reach an inference of bias or unreliability").

We do not find that the district court erred in precluding questioning about the 1953 crash. First, the parties had agreed to operate on a "10–Year Rule" that precluded evidence of events involving Northwest or the flight crew that occurred more than ten years before the crash. We agree with the district court that the logic of this rule implies that Northwest should be barred from inquiring about an event that occurred thirty-four years before the crash and thirty-seven years before the witness's testimony at trial. Second, we agree with the district court (or at least do not believe that the district court abused its discretion in deciding) that the evidence of the 1953 crash was more prejudicial than probative under Fed. R.Evid. 403. The time lapse, the different type of plane, the different type of airport, the different technology, the dubious relevance to the witness's currently-claimed expertise, and the need to avoid detailed inquiry into a separate plane crash—these all spoke for exclusion.

**C**

Finding only a few minor errors in the court's rulings that excluded evidence, we now turn to Northwest's challenges to rulings that admitted evidence. Our standard of review is identical to that discussed at the beginning of Part B. The trial court has broad discretion, and we will not reverse a judgment unless we believe that errors at

trial had a substantial effect on the final result. *Leonard v. Uniroyal, Inc.*, 765 F.2d 560, 567 (6th Cir.1985).

### 1. "Requiring" Northwest to Present Evidence of the Liability Limits on Certain Tickets

One of the issues at trial was whether Northwest could enforce the liability limits on tickets issued to international travellers (the Warsaw cases) and to Northwest employees (the Employee Pass cases). In order to recover from Northwest in excess of the liability limit printed on the back of such tickets, McDonnell Douglas needed to show that the actions of Northwest and/or its crew were "wanton" (Warsaw cases) or "wanton and willful" (Employee Pass cases). On appeal, Northwest now contends that the admission of evidence about the liability disclaimer on the Warsaw and Employee Pass tickets ("ticketing evidence"), and comments made by McDonnell Douglas's counsel informing the jury of the legal effect of a "wanton and willful" finding, swayed the jury's verdict on this issue.

McDonnell Douglas argues that Northwest cannot object to the presence of the ticketing evidence because Northwest itself offered the evidence. We do not believe that this fact defeats Northwest's appeal, on the facts of this case. The district court originally structured the trial so that the ticketing evidence would be presented in the damages section of the trial. The jurors deciding whether Northwest behaved in a "wanton and willful" manner were not to be influenced by their knowledge that, if they did not so find, the estates of some deceased plaintiffs would recover only minor damages.

After all the plaintiffs settled, however, the court changed its mind. It decided that Northwest should present the evidence of the liability limits in the liability trial. The court did not find the organization problematic because it believed the jury able to consider the ticketing evidence fairly. 185 Transcript at 76. Because of the court's restructuring, Northwest had to present the ticketing evidence at the liability trial or waive its partial defense to the Warsaw and Employee Pass claims. Northwest's proffer was not, therefore, voluntary; and Northwest can challenge the court's restructuring on appeal.

Northwest argues that it was error to let the jury know the legal effect of the factual decision it would make. According to Northwest, the ticketing evidence was irrelevant to the finding of willful and wanton misconduct—and could only serve to prejudice the jury. There is merit to Northwest's position. The liability limits are matters of contract and international law. They exist as a voluntary departure from the negligence norm, chosen by parties prior to the tort. A jury that knows the consequences of a heightened liability ruling may reach a verdict that it thinks "right" by conflating the heightened liability standard with simple negligence, thereby violating the agreed terms of a contract or treaty.

Northwest argues that the proper way to cope with the danger of the jury not adequately understanding the need to protect the meaning of "wanton and willful" is to hide from it the consequences of its decision that could potentially cause bias. If the jury's knowledge is confined to the facts, Northwest says, the jury will reach an accurate factual determination. Northwest cites several cases that interpret the general language of Fed.R.Civ.P. 49(a) to mean that "[t]he purpose of a special verdict is to concentrate the jury's attention exclusively upon the fact questions put to them. Comment on the legal effects of the answers could in an appropriate case have a prejudicial effect of clouding this purpose." *Gullett v. St. Paul Fire & Marine Ins. Co.*, 446 F.2d 1100, 1105 (7th Cir.1971). *See also, e.g., Carvalho v. Raybestos–Manhattan, Inc.*, 794 F.2d 454, 457 n. 2 (9th Cir.1986).

We do not believe that hiding the legal consequences of a decision from a jury is the best or only means of coping with the danger of prejudice in a case like the one now before us. If we think the jury unable to grasp the importance of maintaining a legal distinction between two liability tests, the answer, to paraphrase Thomas Jefferson, is not to take power from them, but to educate their dis-

cretion.[22] If a jury is told of the reasons behind a certain legal distinction, either by the parties or by the court, there is no reason, other than a simple lack of faith in the abilities of our citizens, to think that they will not uphold the law.

Our optimism certainly does not extend to all situations. In the present case, it is supported by two observations and one fear. First, this is not a case where the consequences of a jury's decision depend on facts that are not relevant to the question the jury must decide (e.g., a jury is not allowed to know whether a tort defendant is insured). The consequences of the jury's decision depend on a *legal* issue that is inseparable from the factual issue in dispute (the jury must decide if Northwest acted badly enough to justify a recovery despite the tickets' disclaimers). The situation is similar to a jury's determination of "negligence" or "proximate cause." These findings are made daily by juries who know that a party will or will not recover depending on how the jury interprets these terms. Inevitably, juries faced with such questions are policy-makers to a limited extent: they define the operative terms of the law by applying old words to new facts.

Second, to define "wanton and willful"— which the jury must do—requires a knowledge of the context in which these words are used. Some of that context can be supplied by detailed jury instructions. But the jury instructions themselves will leave ambiguities (if they did not, there would be no need for a trial). In interpreting these ambiguities a jury should know the context from which the words spring—and the context of legal words includes the consequences of their application.

Finally—and this is the fear—if the jury is kept ignorant of the true legal context of the words it must apply to the facts of a case, it will invariably invent its own, replacement context. It is better that the jury be "prejudiced" by the true version of the facts than by its own collective fictions. As the Ninth Circuit held in a case precisely on point:

If the jury had not been informed of the connection between the plaintiffs' arguments that Pan Am committed willful misconduct and the damages limitation, the jury would have deduced a connection on its own and it might have been erroneous. The district judge did not abuse his discretion when he decided to eliminate the risk that the jury would deduce an inaccurate connection between a finding of willful misconduct and the damages limitation.

*In re Aircrash in Bali,* 871 F.2d 812, 815 (9th Cir.), *cert. denied,* 493 U.S. 917, 110 S.Ct. 277, 107 L.Ed.2d 258 (1989).

For these reasons, we hold that there was no need to hide the legal consequences of a finding of "wanton and willful" from the jury in this case. We are, however, bothered by one aspect of the district court's handling of this matter. After it became clear that the ticketing testimony would not be stricken from the jury's consideration, Northwest requested that the jury not be allowed to take the ticketing evidence into the jury room, and that the court tell the jury that they should not consider the ticketing evidence when deciding whether Northwest had behaved in a wanton and willful manner. The district court refused both requests.

We do not find the presence of the ticketing evidence and the absence of a limiting instruction troublesome in themselves. However, given Northwest's worries about the jury's attitude, we believe that the court should have given the jury some greater instruction about the context of the wanton and willful test and the jury's obligation to apply the law even if they consider the upshot of their decision unfortunate. Of course, because of the general strength of the jury instructions—not to mention the overwhelming evidence of wanton and willful conduct on the part of Northwest's crew—we do not regard the court's failure to toughen its instructions as material to the outcome of the case.

---

**22.** "I know no safe depository of the ultimate powers of the society but the people themselves; and if we think them not enlightened enough to exercise their control with a wholesome discretion, the remedy is not to take it from them, but to inform their discretion by education." Letter from Thomas Jefferson to William Charles Jarvis (Sept. 28, 1820).

**2. Allowing Gilbertson to Testify, Allowing Him to Testify to Matters Beyond the Scope of His Expertise, and Allowing Him to Testify about Statements Made at the Scene of the Accident by Capt. Nelson**

Northwest next claims that the court erred in allowing the testimony of Edward Gilbertson. Gilbertson was a retired engineer who had worked at Northwest for forty-one years, including twenty-five years as its Chief Electrical/Electronics Engineer. Over Northwest's objection, the court allowed Gilbertson to testify in rebuttal to testimony from Northwest witnesses Benjamin Lightfoot and Rodney Peters that Northwest expected McDonnell Douglas to inform its maintenance personnel about various aspects of the plane's design. Order, February 2, 1991, at 5.

In support of its claim that the court erred in permitting Gilbertson's testimony, Northwest advances three arguments. Northwest contends that the court erred in (1) allowing Gilbertson to testify as an expert on rebuttal; (2) permitting him to testify beyond the scope of direct; and (3) allowing him to present inflammatory hearsay. Each of these arguments is considered in turn.

**(a)**

First, Northwest contends that Gilbertson should not have been allowed to testify as an expert because permitting him to testify violated the Brumby Rule. We do not agree. The Brumby Rule provided that "[o]nly listed witnesses will be permitted to testify at trial, except for rebuttal witnesses whose testimony could not be reasonably anticipated before trial or except for good cause shown." 103 Transcript at 84–85. We agree with the district court that the testimony of Lightfoot and Peters, to which Gilbertson responded, was not testimony that could have been reasonably anticipated by McDonnell Douglas. Order, February 2, 1991, at 5. We also agree with the district court that Northwest suffered no prejudice because the court allowed Gilbertson to testify. *Ibid.* McDonnell Douglas listed Gilbertson in the Joint Final Pretrial Order, June 20, 1989, as a fact witness, and the court allowed Northwest to take Gilbertson's deposition before he testified. Order, February 2, 1991, at 4–5. Northwest also added four exhibits to the Joint Final Pretrial Order in response to Gilbertson's testimony, *id.* at 9, and put on surrebuttal witnesses who criticized Gilbertson's conclusions, *id.* at 13–14.

**(b)**

Second, Northwest argues that Gilbertson's testimony went beyond the scope of permissible rebuttal in violation of Local Rule 40, the Brumby Rule, and the law of the case. Gilbertson's testimony did address a variety of issues. But even if the court erred in allowing Gilbertson to say too much—which we doubt—the error did not result in substantial injustice. Fed.R.Civ.P. 61. As Northwest acknowledges, the "subjects [addressed by Gilbertson on rebuttal] had already been the subject of considerable testimony from MDC witnesses during MDC's case in chief...." Northwest Br. at 36. We generally will not reverse even an erroneous evidentiary ruling if it merely resulted in the submission of redundant information to the jury. *Leonard v. Uniroyal, Inc.*, 765 F.2d 560, 567 (6th Cir.1985).

**(c)**

Third, Northwest claims that Gilbertson's testimony regarding Captain Nelson, Northwest's Vice President of Flight Operations, was inadmissible hearsay. Gilbertson testified that he heard from employees in either Northwest's Maintenance Department or its Flight Operations Department (he was not sure which) that Captain Nelson had called the NW 255 crew "SOBs" after he looked in the cockpit at the crash site and saw that the flap handle was in the retracted position. 189 Transcript at 119. Gilbertson also testified that he had seen a letter containing a notation written by Captain Nelson stating that Northwest's contention that the flap setting callouts could be heard on the CVR tape "comes close to fraud." 189 Transcript at 123–24.

Northwest's challenge to Gilbertson's testimony about Capt. Nelson's statement has merit. Testimony as to Captain

Nelson's statement was hearsay, and therefore inadmissible under Fed.R.Evid. 802. " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R.Evid. 801(c). In one sense, Captain Nelson's calling the NW 255 crew SOBs was not offered for the truth of the matter asserted: McDonnell Douglas was not trying to prove anything about the crew's heritage. In a more meaningful sense, however, McDonnell Douglas used the statement, in effect, as an admission or opinion of wrongdoing, to help prove that the crew made a bad mistake in a careless manner. The context of the statement conveys part of its meaning—and a statement made in a certain context can go to the truth of a matter even if the text of the statement would not.

■ The district court held, and McDonnell Douglas argues now, that the statement was offered not for the truth of the matter asserted, but rather to explain the basis for Gilbertson's opinion that it was not necessary to replace the circuit breakers on Northwest MD–80s (because the crew's errors, not the breakers, caused the crash). We see no such distinction. If the evidence is offered to support an expert's opinion, the evidence is offered for its content—not merely for its effect on the hearer. One can ask: "would the factual statement have the same value at trial regardless of whether it was true or untrue?" The answer to that question is clearly no. An expert is entitled to rely on facts not in evidence if they are "of a type reasonably relied on by experts in the particular field." Fed.R.Evid. 703. However, we do not believe that any sort of expert typically relies on rumors he heard about what some other expert said. McDonnell Douglas clearly offered Capt. Nelson's statement as evidence of wrongdoing on the part of Flight 255's crew.

■ An out-of-court statement offered to prove the truth of the matter asserted is *not* hearsay if it qualifies as an admission by a party-opponent, or an agent of a party-opponent concerning a matter within the scope of his agency or employment under Rule 801(d)(2). Fed.R.Evid. 801(d). The district court held that Capt. Nelson's statement concerned a matter in the scope of his employment (his investigation of the accident scene). We agree—but the court's conclusion does not solve the hearsay problem. Gilbertson heard about Capt. Nelson's statement from unidentified maintenance employees. In this case, the statements of these employees must also fit an exception to the hearsay requirement. As it was not part of the job of these employees to investigate accident scenes or serve as a network for the communication of the results of such investigations, the employees' statements are not admissible.

Nor can we easily conclude that the admission of Capt. Nelson's statements had no prejudicial effect. There is no doubt that whether the crew properly configured the plane's slats and flaps for takeoff was an issue of consequence in this case. Captain Nelson's calling the crew SOBs upon looking into the cockpit of the aircraft and seeing that the flap handle was in the retracted position tends to show that the slats and flaps were not in fact in proper position for takeoff. Furthermore, as invective, the Captain's statement conveyed more emphasis than necessary to make a factual point. It not only spoke to the position of the flaps, but also revealed an emotionally charged, negative view of the crew that was not likely to be soon forgotten by the jury.

■ But the question remains whether there is any chance that the verdict in the case would have been different had Capt. Nelson's statement been excluded as hearsay—i.e., whether admission resulted in substantial injustice. Fed.R.Civ.P. 61. At bottom, Gilbertson's testimony was about whether the flaps and slats had been properly configured for takeoff by the crew. In the course of a trial that lasted nineteen months, there was ample evidence, besides Gilbertson's testimony, that the flaps and slats had *not* been properly configured for takeoff and that the flight crew's performance was poor. On the strength of this other evidence, the admission of Gilbertson's brief testimony, admittedly based on rumors, about Capt. Nelson's statement cannot be said to have resulted in substantial injustice.

Northwest also alleges that the district court erred by allowing Gilbertson to testify that he had seen marginalia written by Captain Nelson on a working version of Northwest's transcript of the cockpit voice recorder tapes. 189 Transcript at 123. The written comment criticized the airline for arguing that the cockpit voice recorder tape indicated that the flaps had been properly set. We do not agree with Northwest that this part of Gilbertson's testimony was inadmissible hearsay. Gilbertson saw the note himself—rather than merely hearing about it from an intervening party. As noted above, a statement is not hearsay if it is offered against a party and is "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." Fed.R.Evid. 801(d)(2)(D). Captain Nelson was an employee of Northwest at the time he wrote the note, and the record permits an inference that the note concerned a matter within the scope of his employment. 189 Transcript at 115–23.

■ Nor do we believe that the admission of testimony about the note ran afoul of Rule 403. Captain Nelson's opinion as to whether the flap setting callouts could be heard on the CVR tape was probative of whether the flaps were properly configured. His comment may have been phrased in a way that was highly critical of Northwest's management, but the district court did not abuse its discretion by deciding that the jury could separate fact from invective.

On the other hand, Northwest may be correct to claim that McDonnell Douglas did not lay an adequate foundation for the admission of the testimony. "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed.R.Evid. 602. As Northwest points out, Gilbertson supplied little detail about the circumstances under which he saw the note he attributed to Captain Nelson. 189 Transcript at 123–26. He did not, for instance, reveal how he determined that Captain Nelson was the author of the notation. *Ibid.* Thus, Gilbertson's testimony that Captain Nelson wrote the note may have lacked the requisite foundation.

■ However, there is no possibility that the admission of Gilbertson's statement resulted in substantial injustice. Prior to the testimony regarding Captain Nelson's note, McDonnell Douglas offered, and the court admitted into evidence, a letter containing a handwritten comment by Nelson stating that Northwest's claim that the flap setting callouts could be heard on the cockpit voice recorder tape "comes close to misrepresenting the truth." Exhibit 30. (It is likely that the two notes are the same.) Because Exhibit 30, which Northwest does not now challenge, is essentially the same as Gilbertson's statement, Gilbertson's statement cannot be so prejudicial as to warrant appellate reversal. *Leonard v. Uniroyal, Inc.,* 765 F.2d 560, 567 (6th Cir.1985) (reversal inappropriate if erroneously admitted testimony redundant).

### 3. Admitting Evidence about the Flight Crew

■ Northwest claims that the district court erred in admitting the training records of Captain Maus, the pilot-in-command of Flight 255. These records contain comments by his instructors that are critical of his flight performance. Northwest also claims that the court erred in admitting evidence of pre-merger practices of Republic and its flight crew. Specifically, Northwest complains about the admission of the 1982 Republic Check Airmen Newsletter (Exhibit 711) and the 1983 FAA Audit of Republic (Exhibit 149–A), which were critical of Republic's piloting procedures, flight crews, and management. According to Northwest, Maus's training records and Republic's (or Republic's crews') pre-merger practices were irrelevant and unfairly prejudicial.

As discussed above, the federal rules define relevant evidence in broad terms. Both Captain Maus's training records and Republic's pre-merger practices were relevant. McDonnell Douglas used Captain Maus's records to show (1) Northwest pilots, including Maus, had longstanding problems with checklist usage; (2) Northwest management was unable or unwilling to correct these

problems by retraining Maus; and (3) the problems persisted until the accident. These facts were important to the determination of Northwest's liability, and evidence about Captain Maus's records helped establish all three facts. McDonnell Douglas also used evidence of Republic's pre-merger practices, including a 1982 company newsletter and a 1983 FAA audit, to support its claim that Northwest failed to train and supervise its pilots adequately.

Northwest claims that, even if Captain Maus's records and Republic's pre-merger practices were relevant, they were prejudicial under Fed.R.Evid. 403. We have no doubt that this evidence was, in one sense, "prejudicial" to Northwest's claims of due care. That "prejudice," of course, is precisely why McDonnell Douglas offered the evidence. But Rule 403 does not exclude evidence because it is strongly persuasive or compellingly relevant—the rule only applies when it is likely that the jury will be moved by a piece of evidence in a manner that is somehow unfair or inappropriate. The truth may hurt, but Rule 403 does not make it inadmissible on that account. A party in Northwest's position does not need an appellate court to protect it from the damaging effects of this sort of allegation. Northwest can and did rely on its own ability to present its side of the story; and the jury below heard considerable favorable evidence presented by Northwest about Maus's training and about Northwest's post–1983 "clean bill of health." For these reasons, we will not reverse the district court's ruling.

### 4. Admitting the Transcript of the Cockpit Voice Recorder Tapes

At trial, the jury heard a recording of the Cockpit Voice Recorder, which automatically recorded cockpit noise and conversation during 255's tragically short flight. The jury was given two transcripts of the tape. One version had been prepared by the National Transportation Safety Board pursuant to its investigation of the crash. The other version was prepared by Northwest. The Northwest version differed in some aspects: for example, it interpreted some questionable garble to be an order by the captain to set the flaps.

Northwest has a bevy of arguments as to why the submission of the NTSB transcript to the jury was an error. It makes four major claims. First, the transcript is sufficiently like an "opinion" of the NTSB Board to be excluded by the statutory prohibition on using an NTSB investigatory report as evidence in a liability case. 49 U.S.C. § 1441(e) (now at § 1154(b)). Second, the report was hearsay, inadmissible under the public records exception of Fed.R.Evid. 803(8)(C). Third, use of the report violates the best evidence rule, Fed.R.Evid. 1002. Fourth, the court did not verify the accuracy of the transcript as required by case law.

We find the first of these arguments marginally persuasive. We are also troubled by the fact that the court did not caution the jury, after submission of the tapes and the transcripts, to resolve any ambiguities between the three sources by listening to the tapes themselves again. However, we do not believe that the submission of the transcript without a proper cautioning instruction—if the submission was error—is so significant as to warrant reversal. The jury was aware of both parties' interpretations of the tapes, and knew that part of its obligation was to determine which interpretation was more accurate. Multiple witnesses testified as to the content of the tapes, a transcript was included in a videotape reconstruction of the accident, and both counsel continuously referred to the content of the transcripts in opening and closing argument. Given these references to the material, any error springing from submission of the NTSB transcript was harmless. See Benna v. Reeder Flying Serv., Inc., 578 F.2d 269 (9th Cir.1978) (harmless error when inadmissible NTSB Report accidentally left with jury).

### 5. Admitting the Circuit Breaker Videotape

Northwest claims that the court erred in allowing Exhibit 3096, McDonnell Douglas's circuit breaker videotape, to be shown to the jury. Exhibit 3096 is a six-minute computer-animated videotape that depicts the operation of a TI 7274–55 circuit breaker. The videotape was used during the testimony of circuit breaker expert John Bryan William-

son to demonstrate the circuit breaker's inner workings. According to Northwest, the court's admission of the videotape violated the Brumby Rule, Rule 26(e)(2) of the Federal Rules of Civil Procedure, and the law of the case. Northwest also contends that the videotape was inadmissible under Rule 403 of the Federal Rules of Evidence.

Northwest maintains that admission of the videotape violated the Brumby Rule, Rule 26(e)(2), and the law of the case, because its contents were not disclosed during the deposition of any McDonnell Douglas witness prior to trial. Northwest argues that Williamson did not disclose during his deposition an intention to use a computer-animated videotape and that, when asked what else he planned to do in the case, he was misleadingly silent.

■ As we mentioned earlier, the so-called Brumby Rule precluded experts from testifying about subjects and opinions not formed at the time of deposition. It did not bar opinions that were formed prior to, but not drawn out at, deposition. The videotape now at issue did not violate the Brumby Rule because it contained no new information. The video simply illustrated what Williamson said in deposition. Furthermore, the court, which had a better grasp of the parties' original intentions regarding their evidentiary agreements than we have now, did not interpret the Brumby Rule to apply to demonstrative evidence.[23] 103 Transcript at 87–88.

■ Rule 26(e)(2) requires that a party supplement a discovery response in certain circumstances.[24] It does not require that a party volunteer information not fairly encompassed by the earlier request. Since Northwest did not depose Williamson concerning matters on the videotape, Rule 26(e)(2) does not preclude the later use of the tape, if otherwise proper.

■ Under the law of the case doctrine, rulings made at one point in a litigation can become operative law for subsequent portions of the litigation. *United States v. Moored,* 38 F.3d 1419, 1421 (6th Cir.1994). Northwest does not explain how admission of the videotape violated the doctrine, except perhaps as premised on a violation of the Brumby Rule or Rule 26(e)(2). Because admission of the videotape did not violate these rules, it did not contravene the law of the case.

■ Northwest also contends that Rule 403 precluded admission of the videotape. Northwest argues that the videotape was inadmissible under Rule 403 because it suggested a similarity to actual events and illustrated MDC's argument that the crew pulled the circuit breaker. We agree that it did both of these things—but do not agree that it was improper. Use of the videotape was limited to demonstration, and the court instructed the jury about the limited basis of its admission. 103 Transcript at 104–15. The district court found, and we cannot disagree, that the probative value of the videotape was not substantially outweighed by its prejudicial effect. *See Four Corners Helicopters, Inc. v. Turbomeca, S.A.,* 979 F.2d 1434, 1442 (10th Cir.1992) ("[T]he task of balancing the probative value of evidence against the harm likely to result from its admission is well-suited for the trial judge who is familiar with the full scope of the evidence.").

The videotape was not, as Northwest contends, offered to simulate what had happened to the circuit breaker in the accident or to simulate the results of Williamson's examina-

---

**23.** Northwest's argument that the Brumby Rule should have applied to "foundational opinions" for demonstrative evidence is unpersuasive. Because not made at trial, the argument is waived. Even if it had not been waived, the argument misses the mark, because the video did not so much contain opinions as it "explain[ed] for the jury the concept of contamination and how the circuit breaker is designed to address the problem of contamination...."
Order, June 6, 1990, at 6.

**24.** Rule 26(e)(2) provides,

A party is under a duty seasonably to amend a prior response to an interrogatory, request for production, or request for admission if the party learns that the response is in some material respect incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing.
Fed.R.Civ.P. 26(e)(2).

tion of that circuit breaker. 103 Transcript at 102. Northwest has not objected on .appeal to the Williamson testimony that was the subject of Exhibit 3096. As McDonnell Douglas points out, Williamson could have drawn the same information on a sketch pad in front of the jury. Moreover, no less than six witnesses testified in defense of the circuit breaker design. The use of the tape was entirely proper.

### D

For the reasons stated above, we affirm the district court's judgments in appeal No. 91–2328 that Northwest is 100% liable for the injuries caused to the sixty plaintiffs by the crash of Flight 255 and, therefore, cannot recover from McDonnell Douglas under a theory of contribution. Some of Northwest's allegations of error are correct. In a trial of this length and complexity, however, it is not remarkable that a few errors were made. Our task on appeal is to remedy errors that warrant remand. We find none.

### III

We turn now to the appeals in Nos. 92–1776 to 92–1787, the so-called "special defense" cases. Northwest's "special defenses" relate to three distinct groups of passengers on Flight 255: (1) the flight crew, (2) off-duty Northwest employees travelling on free passes, and (3) international travellers. Northwest has consistently argued that its liability to these passengers is limited by the express terms of their relationship with the airline. Northwest reached a partial settlement with the special defense plaintiffs prior to trial.

McDonnell Douglas has never sought to enforce any liability limits against the "special defense" plaintiffs. McDonnell Douglas negotiated full settlement agreements with all these plaintiffs, and now seeks to recover from Northwest the money it paid. We must first decide if Northwest's special defenses bar these plaintiffs, in whose shoes McDonnell Douglas is trying to stand, from recov-

ery. If the special defenses apply, then McDonnell Douglas's payments to these plaintiffs in excess of the limits set by the various defenses were essentially gratuitous, and it cannot recover from Northwest. If the special defenses do not apply, we move on to the next question: whether and under what legal theory McDonnell Douglas can recover from Northwest the money it paid to settle the plaintiffs' claims.

### A

#### 1. The Workers' Compensation Cases

 Northwest successfully argued in the trial court that Minnesota's workers' compensation law limits its liability for the injuries suffered by the Flight 255 crew. *Kahle v. McDonnell Douglas Corp.,* No. 88–CV–70526–DT (E.D.Mich. July 23, 1990) (Order). Neither party appeals this finding of limited liability. Northwest, however, challenges the trial court's ruling allowing McDonnell Douglas to recover the money it paid in settlement to the flight crew, up to the liability limits imposed by Minnesota's workers' compensation law. Northwest argues that the trial court erred in applying Minnesota law to McDonnell Douglas's action to recover for these settlements with the flight crew. *Kahle v. McDonnell Douglas Corp.,* No. 88–CV–70526–DT (E.D.Mich. Sept. 4, 1990) (Order). Northwest argues that actions against an employer for joint liability arising out of worker accidents should be governed by the *lex loci delicti,* the law of the place of injury, which is Michigan. Michigan law, unlike Minnesota law, prohibits third parties from seeking indemnification from employers whose employees suffer workplace accidents.[25] The application of Michigan law would prevent McDonnell Douglas from recouping the money it paid in settlement to employees who also filed claims under Minnesota's workers' compensation law.

 Choice-of-law analysis in diversity actions is governed by the law of the state

---

**25.** Contrast *Lambertson v. Cincinnati Corp.,* 312 Minn. 114, 257 N.W.2d 679 (1977) (allowing employer to be sued for contribution up to amount of liability permitted by workers' com-

pensation law) with *Downie v. Kent Prods., Inc.,* 420 Mich. 197, 362 N.W.2d 605, 613 (1984) (prohibiting third-party indemnity and contribution actions against employer).

where the federal court sits. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). The Michigan Supreme Court has adopted "no specific methodology" to resolve conflicts of law, and "each case must be evaluated on the circumstances presented." *Olmstead v. Anderson*, 428 Mich. 1, 400 N.W.2d 292, 302 (1987). *See also Sexton v. Ryder Truck Rental, Inc.*, 413 Mich. 406, 320 N.W.2d 843, 854 (1982) (plurality opinion). While this case-by-case approach provides limited guidance to courts resolving conflicts, Michigan decisions have clearly established that a court must have a rational reason to justify displacing the law of the forum, *lex fori*, in favor of a foreign law. *Olmstead*, 400 N.W.2d at 302; *Farrell v. Ford Motor Co.*, 199 Mich.App. 81, 501 N.W.2d 567, 569 (1993); *Mahne v. Ford Motor Co.*, 900 F.2d 83, 86–87 (6th Cir.), *cert. denied*, 498 U.S. 941, 111 S.Ct. 349, 112 L.Ed.2d 313 (1990). A majority of courts applying Michigan's choice-of-law rules employ a "balancing-of-interests" approach to resolve conflicts problems. *Olmstead*, 400 N.W.2d at 301–02. *See, e.g., Farrell*, 501 N.W.2d at 570; *Mahne*, 900 F.2d at 86.

Both parties agree that the workers' compensation law of Minnesota governs the claims brought by the flight crew against Northwest. Minnesota has the strongest interest in the resolution of these claims because the employment relationship is centered in Minnesota, the home state of Northwest and the flight crew. However, the parties vigorously dispute whether Minnesota or Michigan law should govern McDonnell Douglas's action for indemnification.

Northwest argues that Michigan has a strong interest in defining tort liability within its boundaries. While Northwest admits that the crew's claims against Northwest are governed by Minnesota law, it contends that the indemnity action arising out of the employees' injuries should be governed by the *lex loci delicti*. Northwest points out that, unlike the employer-employee relationship between the crew and airline, the relationship between McDonnell Douglas and Northwest is not centered in Minnesota. Accordingly, Northwest concludes that there is no persua-

sive reason not to apply Michigan law, which is both the *lex loci delicti* and the *lex fori*, to McDonnell Douglas's indemnity claim. We disagree. Minnesota's strong interest in regulating an employer's accident liability outweighs the interest Michigan has in determining the liability of Northwest and McDonnell Douglas.

■ All fifty states have adopted workers' compensation plans. *See, e.g.*, Minn. Stat. Ch. 176 *et seq.* (1992). These plans establish comprehensive programs for compensating the victims of workplace accidents. By allowing recovery of a limited nature without regard to fault, these plans simultaneously limit the employer's liability while guaranteeing compensation to the injured worker. Workers' compensation programs thus provide cherished security to both the employer and the employee. The benefits of such a scheme have been eloquently summarized:

> Workmen's compensation laws were designed to provide an expeditious and certain remedy for employees who sustain work injuries by the statutory imposition of absolute but limited and determinate liability upon the employer. These laws ... represent a compromise that inures to the ultimate benefit of both employer and employee. The employee surrenders his right to seek damages in an action at law in return for swift recovery independent of proof of fault. The employer gives up common law defenses to negligence suits and assumes an absolute liability to provide compensation; in return he is granted immunity from common law negligence suits by his employees.

*Wilson v. Faull*, 27 N.J. 105, 141 A.2d 768, 774 (1958) (citations omitted).

Employees may seek to augment their recovery for workplace injuries by suing a party other than the employer, such as an equipment manufacturer. The defendant in the resulting tort action may implead the employer as a joint tortfeasor or indemnor. Such suits indirectly subject the employer to common law tort liability for the workplace accident, in frustration of the workers' compensation scheme. *Lewis v. Chemetron Corp.*, 448 F.Supp. 211, 213 (W.D.Pa.1976);

*Paulo v. Bepex Corp.*, 792 F.2d 894, 895–96 (9th Cir.1986). *See also* Restatement (Second) of Conflict of Laws § 184 cmt. b (1971) ("to deny a person the immunity granted him by a workmen's compensation statute of a given state would frustrate the efforts of that state to restrict the cost of industrial accidents"). In consideration of this possibility, some states have expressly forbidden third-party actions against employers for contribution or indemnity arising out of workplace accidents. Other states have decided to permit third-party actions in an effort fairly to distribute among responsible parties the loss caused by the accident. One commentator has suggested that a state's receptiveness or hostility towards third-party actions for contribution or indemnity is "[p]erhaps the most evenly-balanced controversy in all of compensation law." 2B Larson, Workmen's Compensation § 76.11 (1993 ed.). Since Minnesota allows a third party to recover from an employer, while Michigan does not, we are faced with a true conflict of laws.

We find no binding precedent that resolves the choice-of-law issue. Neither this court nor the Michigan Supreme Court has addressed the precise question posed by this case: what law would Michigan courts apply to a third-party recovery action for workplace accident liability where the employment relationship is centered in Minnesota but the accident occurred in Michigan? We need not write on an entirely blank slate, however, since we have employed Michigan choice-of-law analysis in the workplace injury context before. *General Motors Corp. v. National Auto Radiator Mfg. Co., Ltd.*, 694 F.2d 1050 (6th Cir.1982).[26] We may also benefit from the work of other courts that have addressed the question we now face. *See, e.g., Lewis v. Chemetron*, 448 F.Supp. at 213; *Ackerman v. Southern Wood Piedmont Co.*, 409 F.Supp. 469 (E.D.N.Y.1976).

In *National Radiator*, a workplace accident resulted from the malfunction of a machine sold by General Motors (GM) to a Canadian company, National Auto Radiator (National). The accident occurred in Windsor, Ontario, and the employee was compensated pursuant to Ontario's workers' compensation law. The worker also filed an action in Michigan state court against GM, whereupon GM sought indemnification from the employer. The trial court dismissed GM's action because Ontario's workers' compensation scheme prohibits impleading an employer into tort actions arising out of workplace accidents. On appeal, this court determined that Ontario law properly governed the suit for indemnity because "the employer-employee relationship is of paramount importance, and Ontario has the overriding interest in this relationship since the underlying suit involved an application of the Ontario Workers' Compensation Act to a claim by an Ontario employee against his employer." *National Radiator*, 694 F.2d at 1054. *Accord Chemetron*, 448 F.Supp. at 213 (state where workers' compensation claims were processed had "most significant interest in the application of its policies") (citing *Elston v. Industrial Lift Truck Co.*, 420 Pa. 97, 216 A.2d 318, 324 (1966)).

In light of the central importance of a state's policy towards indemnity actions in the overall workers' compensation scheme, we decline Northwest's invitation to apply Minnesota law to the workers' claims while applying Michigan law to the action for indemnity resulting from the same accident. The decision to allow third-party indemnity suits substantially defines an employer's liability for workplace accidents. We believe that the need for cohesiveness in Minnesota's workers' compensation laws favors application of Minnesota law to this dispute in its entirety. As we noted in *National Radiator*, "[i]t would be an anomalous result to hold that the law of [the workers' state's] should apply in the underlying personal injury action, but that the law of Michigan applies to

---

**26.** We acknowledge that Michigan's choice-of-law doctrine has changed in many respects since *National Radiator* was decided. Notably, the rule of *lex loci delicti* has been abandoned in favor of a flexible case-by-case approach, often requiring the court to balance the interests of the various states connected to the case. However, the conflict of laws analysis conducted in *National Radiator* refused to apply the rigid rule of *lex loci delicti*, and the interest balancing conducted in that case comports substantially with the analysis now required by the Michigan Supreme Court's decision in *Olmstead, supra.*

the derivative claims of contribution or indemnity brought in a subsequent suit." 694 F.2d at 1054.

Our choice of law finds ample support in the Restatement (Second) of Conflicts, which has been cited with approval in Michigan. *See Chrysler Corp. v. Skyline Indus. Serv., Inc.*, 199 Mich.App. 366, 502 N.W.2d 715, 717 (1993). Section 173 of the Restatement suggests that courts decide indemnity claims according to the law applied to the underlying tort. In the workers' compensation context, § 184(a) of the Restatement suggests that courts decide the employer's immunity from claims for indemnity according to the workers' compensation laws under which the employee receives payment.

> Recovery for tort ... will not be permitted in any state if the defendant is declared immune from such liability by the workmen's compensation statute of a state *under which the defendant is required to provide insurance* against the particular risk and under which the plaintiff has obtained an award for the injury.

Restatement (Second) Conflicts § 184(a) (emphasis added). Northwest employed the crew of Flight 255 in Minnesota, a state that has established a comprehensive system regulating workplace accidents. The crew of Flight 255 claimed payment under this workers' compensation scheme. Therefore, we will determine Northwest's rights and liabilities "on account of the work-connected injury" according to Minnesota law. *Kabak v. Thor Power Tool Co.*, 106 Ill.App.2d 190, 245 N.E.2d 596, 601 (1969).

The majority of courts addressing this issue have chosen to apply the law that governs the employment relationship to claims for indemnification. *See* 4 Larson, Workmen's Compensation, § 88.00 ("As to third-party actions, if compensation has been paid in a foreign state and suit is brought against a third party in the state of injury, the substantive rights of the employee ... and the employer are ordinarily held governed by the law of the foreign state although there is contra authority."). Northwest identifies several decisions that it believes justify the application of the *lex loci delicti* to McDonnell Douglas's indemnity action. Many of the cases are distinguishable on the facts.[27]

We recognize that a string of workers' compensation cases decided by federal district courts in New York has tipped the balance of interests in favor of the *lex loci delicti* over the law of the state of employment. *See Jones v. Munson Transp., Inc.*, 685 F.Supp. 879, 882 (E.D.N.Y.1988) ("New York policy allowing indemnification and contribution actions against employers shows a much stronger interest than that of Wisconsin in keeping employers free of liability."); *Gregory v. Garrett Corp.*, 578 F.Supp. 871, 882 (S.D.N.Y.1983) (New York has "overwhelming interest" in allowing contribution actions, although court recognizes that some might criticize decision for giving "too little consideration to New Jersey's express interest in barring third-party actions against employers."). However, our analysis of Michigan law does not persuade us that Michigan courts, if faced with the same issue, would follow suit.

The Michigan Supreme Court has expressly rejected the rigid doctrine of *lex loci delicti* in favor of a flexible case-by-case analy-

---

27. *Barry v. Baker Elec. Coop., Inc.*, 354 N.W.2d 666, 672 (N.D.1984), differs significantly from the case at bar because the employment relationship in *Barry* was not centered in either of the two states connected to the dispute. Here, of course, the parties and the trial court agreed that the relationship between the airline and the flight crew was centered in Minnesota. Similarly, the employment relationship in *Miller v. Long–Airdox Co.*, 914 F.2d 976, 978 (7th Cir.1990), was connected to two states. Notwithstanding the *Long-Airdox* court's unfounded speculation that the employment relationship might be centered in Illinois, that case presented a situation in which the employee's domicile and the employer's "principal place of business" were located in Indiana, and the work occurred in both Indiana and Illinois. *Sargent Indus., Inc. v. Delta Air Lines, Inc.*, 251 Ga. 91, 303 S.E.2d 108, 110 (1983), sheds no light whatsoever on this case since the forum state employed the *lex loci delicti* as the choice-of-law rule, whereas Michigan has expressly abandoned the *lex loci delicti* approach. The case cited to this court that most closely resembles the case at bar is *Busby v. Perini Corp.*, 110 R.I. 49, 290 A.2d 210 (1972), in which Massachusetts law was applied to resolve workers' compensation indemnity issues despite the occurrence of the injury in Rhode Island, because the employment relationship was centered in Massachusetts.

sis. *See Olmstead*, 400 N.W.2d at 302. Both Michigan and Minnesota, and a majority of other states, in our judgment, place a high degree of importance upon the need for cohesiveness in the interpretation of a state's workers' compensation legislation. The balance of interests in this case requires the application of Minnesota law to McDonnell Douglas's claim for indemnification. According to the law of Minnesota, McDonnell Douglas is not precluded from recovering from Northwest—at least not within the general liability confines of the workers' compensation system.

## 2. The Warsaw Convention Cases

The Warsaw Convention is a treaty to which the United States is a party. *Air France v. Saks*, 470 U.S. 392, 395–96, 105 S.Ct. 1338, 1340–41, 84 L.Ed.2d 289 (1985). The Convention applies to all international commercial air traffic, and limits an airline's liability to passengers injured in international travel to $75,000 unless the plaintiff establishes "willful misconduct" on the part of the airline. Warsaw Convention, Art. 25(1), Oct. 12, 1929, 49 Stat. 3000, T.S. No. 876 (1934) (reprinted in 49 U.S.C.App. (1988 ed.) § 1502 note).[28] Northwest challenges the jury's determination that it engaged in willful misconduct. Northwest specifically disputes the jury instruction defining willful conduct under the Warsaw Convention. Northwest argues that the instruction failed to distinguish between ordinary negligence and willful misconduct. If Northwest committed "only" ordinary negligence, the international travellers' recovery may not exceed the liability limit of the Warsaw Convention, and this liability limit restricts McDonnell Douglas's potential recovery.

The trial court issued the following instruction in the Warsaw cases:

Willful misconduct under federal law is defined as the intentional performance of an act or the failure to act, with knowledge that it probably will result in an injury or harm, or the intentional performance of an act in some manner as to imply a reckless

disregard of the consequences of its performance.

. . .

In making your determination of willful misconduct, it need not be based upon a single act on the part of Northwest Airlines. Instead, you may consider the effect of a series of actions or inactions by Northwest Airlines.

Northwest argues that this instruction permitted the jury to render judgment in the Warsaw cases pursuant to an impermissible legal theory—a theory of ordinary negligence. Northwest correctly insists that ordinary negligence on its part does not invalidate the Warsaw Convention liability limit. Accordingly, the question is whether the instructions given to the jury properly distinguished ordinary negligence from more culpable conduct. If the trial judge incorrectly instructed the jury to lift the liability limit if Northwest's behavior was "merely" negligent, we must reverse the judgment in the Warsaw cases. *See Brandenburg v. Cureton*, 882 F.2d 211, 214 (6th Cir.1989) (verdict based on improper legal theory "cannot stand"). However, if the jury was instructed to lift the liability limit only if Northwest's conduct exceeded ordinary negligence, the verdict will be set aside only if no reasonable juror could have reached such a conclusion. *Bellamy v. Bradley*, 729 F.2d 416, 418 (6th Cir.), *cert. denied*, 469 U.S. 845, 105 S.Ct. 156, 83 L.Ed.2d 93 (1984).

Several federal courts have addressed the issue of willful misconduct under the Warsaw Convention. *See, e.g., KLM v. Tuller*, 292 F.2d 775 (D.C.Cir.), *cert. denied*, 368 U.S. 921, 82 S.Ct. 243, 7 L.Ed.2d 136 (1961); *Butler v. Aeromexico*, 774 F.2d 429 (11th Cir. 1985); *In re Air Disaster at Lockerbie*, 811 F.Supp. 84 (E.D.N.Y.1992). The jury instruction challenged by Northwest was approved in large part by an appellate panel in *KLM*. 292 F.2d at 778–79. However, Northwest specifically criticizes one instruction presented to the jury in this case that was not presented to the *KLM* jury: "[y]our determination of willful misconduct [need]

---

**28.** The relevant part of Article 25(1) reads: "[A] carrier shall not be entitled to avail himself of the provisions of this convention which exclude or limit his liability, if the damage is caused by his wilful misconduct."

not be based upon a single act.... [Y]ou may consider the effect of a series of actions or inactions...." Northwest claims that this instruction improperly permitted the jury to "conglomerate" individual instances of ordinary negligence into a finding of willful misconduct without finding that Northwest committed any single act constituting willful misconduct.

█ We do not agree with Northwest that the jury should have been prohibited from viewing the airline's individual mistakes together as a "series of actions or inactions" exhibiting reckless disregard for the safety of the passengers. No principle of law or logic requires a jury evaluating willful misconduct to focus exclusively on discrete acts, without regard for the complete chain of events leading to the accident. This is especially true if those acts, though individual, nevertheless reflect an overall frame of mind or course of conduct which led to them.

Northwest contends that the court's adaptation of the KLM "willful misconduct" instruction deviates substantially from the jury instructions in other Warsaw Convention cases. Northwest overlooks a functionally-equivalent jury instruction given in the Lockerbie trial. In that case, the jury was instructed:

> Plaintiffs claim multiple violations of said regulations and standards by the defendants and their employees and have detailed in their summary arguments the particular conduct and particular regulations and standards which they say constituted these violations, one or more or all of which, together with the remainder of their evidence, according to them, prove both misconduct and willfulness....

MDL No. 799, Transcript at 6558 (E.D.N.Y. July 7, 1992).[29]

The issuance of this instruction in Lockerbie refutes Northwest's contention that the court deviated from the standard "willful misconduct" instruction. Northwest offers no precedent that embraces its conception of willful misconduct, and none of the cases it cites purport to criticize the language of the challenged jury instruction. Northwest attempts to summarize other Warsaw Convention cases, from which it deduces a prohibition on "conglomerating" a series of distinct acts in assessing willful misconduct. However, our reading of this precedent yields a contrary conclusion: courts have found reckless disregard for passenger safety in a series of distinct errors. The tragic parade of this precedent suggests that such accidents typically result from a sequence of mistakes.

The opinion of Judge Burger (as he was then) for the appellate panel in KLM addressed the crash of a plane into a river. Although most of the passengers survived, the plaintiff perished due to ineffective rescue efforts. Judge Burger upheld the jury verdict finding KLM guilty of willful misconduct in failing to rescue the plaintiff. Judge Burger summarized the sequence of events constituting "willful misconduct":

> (1) failure to properly instruct the passengers of the location of life vests and in their use; (2) failure to broadcast an emergency message; (3) failure to take steps to provide for the safety of [the plaintiff] after his peril was known; and (4) failure of [KLM ground crew] to be aware of the loss of radio communication with the plane and to initiate prompt search and rescue operations.

KLM, 292 F.2d at 779.

Judge Burger concluded that this *series* of unfortunate mishaps was sufficient to vitiate

**29.** Northwest incredulously disputes that the Lockerbie judge permitted the jury to consider "one or more or all" of the alleged mistakes together in finding willful misconduct. But Northwest totally disregards the following comments by the Lockerbie trial judge in response to the plaintiffs' request for clarification of the "willful misconduct" instruction:

> ATTORNEY: We asked in our original request that the Court charge that a combination of acts and omissions could constitute willful misconduct, even though each particular act or omission did not in and of itself constitute—

> THE COURT: I think I made that abundantly clear in the—
> ATTORNEY: You said that was our argument. I don't think it was clearly stated that that was the law.
> THE COURT: I think I have covered that.... I have covered that adequately. You certainly covered that in your summations.

Lockerbie, MDL No. 799, Transcript at 6573. The cites from the Lockerbie transcript are not published; they appear in Northwest's Br. in Nos. 92–1776 et seq. at Appendix E.

the liability limit of the Warsaw Convention. Judge Burger's analysis gives no indication that he felt compelled to view each of the airline's mistakes in isolation, as Northwest now urges us to do.

In *Butler v. Aeromexico,* the court upheld a jury finding of willful misconduct in the death of passengers in a plane crash and fire in Mexico. The court concluded that the jury could properly infer willful misconduct from evidence of several errors committed during the course of the flight. The court emphasized the following mistakes, which taken as a whole supported the jury's finding: (1) failure to monitor weather reports; (2) failure to use the weather radar; (3) attempting to land the plane in poor weather; (4) failure to shut down the engines after the plane crashed; and (5) failure to evacuate the plane promptly. 774 F.2d at 431–32.

In *Lockerbie,* the jury concluded that a series of mistakes leading to the airline's failure to detect a bomb exhibited willful misconduct. The court found that the jury inferred willful misconduct from the following evidence at trial: (1) failure to train x-ray inspectors properly; (2) failure of a particular inspector to wear eyeglasses; and (3) failure of security staff to heed warnings that a similar bomb was uncovered recently at another airport. 811 F.Supp. at 87–89.

These air crash cases illustrate that a finding of willful misconduct may be based upon consideration of a series of actions or inactions, as the court instructed in the action below. Many complex safety systems interact during an airplane flight, so one disaster frequently requires multiple errors.

■ Once we hold that the jury instructions were proper in the Warsaw cases, all that remains of Northwest's argument is an assertion that the facts do not support a finding of willful misconduct. The limited scope of appellate review, reinforced by our skepticism that we can evaluate 189 days of evidence more wisely than the jury, prevents us from disturbing the jury's finding. As the court explained in denying Northwest's motion for a directed verdict, and as we have detailed elsewhere in this opinion, there was substantial evidence of Northwest's willful

misconduct offered at trial. Order, November 6, 1990, at 26.

■ Since we uphold the jury finding of willful misconduct in the Warsaw cases, the liability limit of the Warsaw Convention poses no barrier to the international travellers' personal injury recovery and sets no limit to Northwest's ultimate liability to McDonnell Douglas for amounts paid in settlement.

### 3. The Employee Pass Cases

■ The third and final category of "special defense" cases are the claims brought by employees flying on free flight passes. The off-duty Northwest employees travelling on Flight 255 were ticketed pursuant to Northwest "Employee Easy–Write Travel Passes," containing provisions limiting Northwest's liability for personal injury damages. *See In re Air Crash at Detroit Metro. Airport,* 756 F.Supp. 321, 322 (E.D.Mich. 1991). Under federal law, a common carrier cannot contractually limit its liability for damages resulting from willful and wanton misconduct. *Braughton v. United Air Lines,* 189 F.Supp. 137, 143 (W.D.Mo.1960); *Martin v. Greyhound Corp.,* 227 F.2d 501 (6th Cir. 1955), *cert. denied,* 350 U.S. 1013, 76 S.Ct. 657, 100 L.Ed. 873 (1956). Therefore, a jury finding of willful and wanton misconduct vitiates the liability limit in the "Easy–Write Travel Pass." Because state law governs the standard of misconduct for the employee pass cases—which may deviate from the standard of conduct necessary to vitiate the liability limit in the Warsaw cases—the district court formulated a separate instruction on willful and wanton misconduct under Michigan law. *See Braughton,* 189 F.Supp. at 143 (state common law defines willful misconduct in travel pass cases); *Air Crash at Detroit Metro. Airport,* 756 F.Supp. at 322.

The exact definition of willful and wanton misconduct under Michigan law was subject to an extended dispute between the parties. *Ibid.* Again, Northwest maintains that the jury instruction that the court ultimately selected failed to distinguish ordinary negligence from willful and wanton misconduct.

The court instructed the jury to apply the following standard of willful and wanton mis-

conduct, derived from *Gibbard v. Cursan*, 225 Mich. 311, 196 N.W. 398, 402 (1923):

> Willful or wanton misconduct exists under Michigan law if you find that: Northwest Airlines knew of a situation requiring the exercise of ordinary care and diligence to avert injury to another; Northwest had the ability to avoid the resulting harm by ordinary care and diligence in the use of the means at hand; and Northwest Airlines failed to use such care and diligence to avert the threatened danger when, to the ordinary mind, it would have been apparent that the result was likely to prove disastrous to another.

Northwest complains that this instruction permitted the jury to find willful and wanton misconduct without finding either an intent to harm the passengers or a reckless indifference to their safety. Northwest wanted the court to instruct the jury that intent to harm or some equally-culpable mental state is prerequisite to finding willful and wanton misconduct under Michigan law.

We do not believe that the court's instruction was improper. The instruction carefully paraphrased the definition of willful and wanton misconduct in *Gibbard*. *See* 196 N.W. at 402. While some have criticized the *Gibbard* instruction, it remains the law of Michigan. In *Burnett v. City of Adrian*, 414 Mich. 448, 326 N.W.2d 810, 812 (1982), the court entertained arguments for reformulation of the *Gibbard* test. The court expressed its concern, much as does Northwest, that "[t]he poorly phrased three-prong test for willful and wanton misconduct in *Gibbard* is cast entirely in the language of ordinary negligence." *Burnett*, 326 N.W.2d at 812. Nevertheless, the *Burnett* court concluded that the *Gibbard* test adequately encompassed the culpable mental state of reckless disregard for safety because the test requires the plaintiff to show "that an injury [was] likely" to result from the defendant's conduct. *Ibid.* The court explained:

> [i]t is in that concept—the notion that in the circumstances of a given case the injury is probable, or to be expected, or likely—that is found the requisite indifference to harm tantamount to a willingness that it occur, if not a specific intent that it does,

which distinguishes willful and wanton misconduct from ordinary negligence. *Ibid.*

The *Burnett* court expressly declined to disturb the long-established *Gibbard* test, noting that "this appeal is an inappropriate opportunity to attempt to reconcile the confused and disparate pronouncements of Michigan's appellate judiciary concerning the concepts of gross negligence and willful and wanton misconduct." *Burnett*, 326 N.W.2d at 811. *Gibbard* is still the applicable Michigan law. *See Cheeseman v. Huron Clinton Metro. Auth.*, 191 Mich.App. 334, 477 N.W.2d 700, 701 (1991); *Weaver v. United States*, 809 F.Supp. 527, 533 (E.D.Mich.1992). Accordingly, we find no merit in Northwest's contention that the court failed to present properly the legal standard of willful and wanton misconduct to the jury.

Northwest also challenges the factual basis for finding willful and wanton misconduct in the Employee Pass cases. We find this argument unpersuasive for the same reasons outlined in our discussion of the Warsaw cases.

**B**

■ For these reasons, we hold that Northwest cannot assert successfully the liability limits in the Warsaw and Employee Pass cases. Northwest *can* assert the liability limit in Minnesota's workers' compensation laws, a point that McDonnell Douglas does not dispute. However, Northwest cannot use the workers' compensation laws to avoid paying amounts up that liability limit.

We now consider whether the district court erred in holding that McDonnell Douglas could step into the plaintiffs' shoes and proceed against Northwest. There are three possible theories upon which McDonnell Douglas could base a right to recover.

**1. Contribution**

■ Michigan law provides for contribution between tort-feasors. *See* M.C.L.A. § 600.2925a (1993). The right to contribution exists between "persons [who] become jointly or severally liable in tort for the same injury." *Ibid.* The trial court denied

McDonnell Douglas contribution, concluding that the jury's exoneration of McDonnell Douglas from responsibility for the accident precluded McDonnell Douglas and Northwest from having a "common liability" in tort to which contribution rights attach. *Air Crash at Detroit Metro. Airport,* 791 F.Supp. at 1234–36. We agree.

 The right to contribution ensures that a common burden of liability is equitably distributed among responsible parties. *See United States Fidelity & Guar. Co. v. Liberty Mut. Ins. Co.,* 127 Mich.App. 365, 339 N.W.2d 185, 189 (1983). A party claiming contribution must show (1) a "joint liability" among the parties, and (2) payment by one party of a disproportionate share of the liability. *Ibid.; Klawiter v. Reurink,* 196 Mich. App. 263, 492 N.W.2d 801, 803 (1992). The right to contribution only lies between parties sharing a common tort liability. *See Downie v. Kent Products,* 362 N.W.2d at 615 ("Under the contribution statute, there must be a 'common burden of liability in tort' shared among the tortfeasors.") (citing *O'Dowd v. General Motors Corp.,* 419 Mich. 597, 358 N.W.2d 553, 557 (1984)).

McDonnell Douglas seeks contribution from Northwest because it paid a disproportionate share of the liability to the special defense plaintiffs. But McDonnell Douglas has not established that the "burden of liability" which it satisfied was a common burden in tort shared by McDonnell Douglas and Northwest. At trial, McDonnell Douglas demonstrated its lack of liability for the crash so persuasively that it was totally exonerated by the jury. The jury effectively determined that McDonnell Douglas and Northwest did not share a common burden in tort.

 McDonnell Douglas argues that the "common liability requirement" is satisfied because it "conceded" liability in its settlement with the plaintiffs. McDonnell Douglas Br. in Nos. 92–1776 *et seq.* at 45. McDonnell Douglas cites no Michigan precedent equating a settlement's implication of liability with a "common burden of liability in tort." McDonnell Douglas's liability to the special plaintiffs under the settlement agreement is contractual, not delictual, in nature. *See Hi-*

*saw v. Hayes,* 133 Mich.App. 639, 350 N.W.2d 302, 303 (1984) ("settlements are contracts and are governed by the legal principles applicable to contracts"). Therefore, the stipulation to liability does not allow McDonnell Douglas to seek contribution under Michigan law.

## 2. Indemnity

 McDonnell Douglas also unsuccessfully sought recovery from Northwest on a theory of common law indemnity. *See Air Crash at Detroit Metro. Airport,* 791 F.Supp. 1204, 1236–37 (E.D.Mich.1992). Because a claim for indemnity, like a claim for contribution, must arise out of a common burden of liability, Judge Cook denied McDonnell Douglas indemnity. We agree with the trial court that McDonnell Douglas was not entitled to indemnity under Michigan law because no common liability existed between McDonnell Douglas and Northwest.

 "Indemnity serves to shift the burden of loss" between parties "when equity so requires." *Langley v. Harris Corp.,* 413 Mich. 592, 321 N.W.2d 662, 667 (1982). "[I]ndemnity shifts the entire loss from the party who has been forced to pay to the party who should properly bear the burden." *Ibid.* A right to indemnity exists where a party's liability is imposed "vicariously or by operation of law from the acts of the party from whom indemnity is sought." *Ibid.; Hardy v. Monsanto Enviro–Chem Sys., Inc.,* 414 Mich. 29, 323 N.W.2d 270, 294–95 (1982). A party seeking indemnity must be free from personal fault. *Langley,* 321 N.W.2d at 665; *Hardy,* 323 N.W.2d at 294–95.

 Indemnity is unavailable to a plaintiff who can not establish some common liability with the party from whom indemnity is sought. If the plaintiff is not liable on the underlying obligation, the plaintiff is not entitled to indemnity for having settled an otherwise unenforceable obligation. *See Proctor & Schwartz, Inc. v. United States Equip. Co.,* 624 F.2d 771, 775 (6th Cir.1980) ("established Michigan law provides that a party is not entitled to indemnity if it was not, in fact, liable for the judgment in the underlying action") (citing *Knickerbocker v. Wilcox,* 83

Mich. 200, 47 N.W. 123 (1890)); *see also Tankrederiet Gefion A/S v. Hyman–Michaels Co.*, 406 F.2d 1039 (6th Cir.1969). Because McDonnell Douglas was exonerated of liability by the jury, McDonnell Douglas had no actual liability arising from the air crash, and McDonnell Douglas is not entitled to be indemnified for the money paid in settlement of the special defenses cases.[30]

### 3. Equitable Subrogation

■ McDonnell Douglas's final ground for recovery from Northwest is the equitable doctrine of subrogation. McDonnell Douglas claims that it has satisfied an obligation to the special defense plaintiffs for which Northwest is primarily liable, and that an unjust enrichment of Northwest can be avoided only by forcing Northwest to reimburse it. We agree that the liability to the special defense plaintiffs is an obligation that justice and equity require Northwest to assume, and uphold the district court's order allowing McDonnell Douglas to recover from Northwest under a theory of equitable subrogation.

■ Equitable subrogation is a legal fiction, which permits a party who satisfies another's obligation to recover from the party "primarily liable" for the extinguished obligation. *See, e.g., Auto Club Ins. Assoc. v. New York Life Ins. Co.*, 440 Mich. 126, 485 N.W.2d 695, 698 (1992); *Atlanta Int'l Ins. Co. v. Bell*, 438 Mich. 512, 475 N.W.2d 294, 298 (1991). The doctrine

> rests on the equitable principle that one who, in order to protect a security held by him, is compelled to pay a debt for which another is primarily liable, is entitled to be substituted in the place of and to be vested with the rights of the person to whom such payment is made, without agreement to that effect.

*Auto Club*, 485 N.W.2d at 698 (citations omitted).

■ The doctrine of equitable subrogation benefits from the flexibility of appli-

cation that is characteristic of all equitable remedies. *See Atlanta Int'l*, 475 N.W.2d at 298. The doctrine is "broad enough to include every instance in which one party pays the debt for which another is primarily answerable." *Allstate Ins. Co. v. Snarski*, 174 Mich.App. 148, 435 N.W.2d 408, 411 (1988). Notions of "equity and good conscience" should guide a court's application of the doctrine. *Ibid.* Subrogation is an important device for "placing the economic responsibility for injuries on the party whose fault caused the loss." *Atlanta Int'l*, 475 N.W.2d at 298 n. 13 (citation omitted). The doctrine "prevent[s] unjust enrichment by assuring that the person who in equity and good conscience is responsible for the debt is ultimately answerable for its discharge." *Kala Investments, Inc. v. Sklar*, 538 So.2d 909, 917 (Fla.App.1989).

■ Equitable subrogation claims arise where one party satisfies a disproportionate share of an obligation for which two or more parties are potentially liable. *See, e.g., Auto Club*, 485 N.W.2d at 698 (two insurers potentially liable for injured party's medical bills); *Allstate*, 435 N.W.2d at 411 (two insurers potentially liable for automobile accident damage). Because subrogation is a flexible equitable doctrine, it allows recovery where the formal requirements of contribution or indemnity are not satisfied. *Dantzler Lumber & Export Co. v. Columbia Cas. Co.*, 115 Fla. 541, 156 So. 116, 119 (1934) (equitable subrogation achieves "complete and perfect justice between the parties without regard to form"). *See, e.g., American Nat. Fire Ins. Co. v. Frankenmuth Mutual Ins. Co.*, 199 Mich.App. 202, 501 N.W.2d 237, 245 (Mich.App.1993) (equitable subrogation provided alternative justification for recovery if contribution unavailable); *Kala*, 538 So.2d at 916–17.

■ The application of the doctrine of equitable subrogation is subject to two fundamental constraints. First, a party who pays another's debt as a mere volunteer can not

---

**30.** McDonnell Douglas argues that in certain circumstances indemnity may be based on "potential liability" as opposed to actual liability on the underlying obligation. *See generally Trim v. Clark Equip. Co.*, 87 Mich.App. 270, 274 N.W.2d 33 (1978). However, this exception to the general rule we apply today has only been extended to disputes based on contractual indemnity (which is governed by statute), as opposed to the common law indemnity sought here. *Ibid.*

recover under equitable subrogation. *Auto Club*, 485 N.W.2d at 698. Secondly, a party who is primarily obligated on the underlying debt can not use equitable subrogation to recover from the other parties involved. *Michigan Hosp. Serv. v. Sharpe*, 339 Mich. 357, 63 N.W.2d 638, 641 (1954).

 The trial court determined that McDonnell Douglas was not a "mere volunteer" precluded from equitable subrogation because McDonnell Douglas settled with the special plaintiffs in response to the threat of litigation. We see no reason to upset this conclusion, and evidently neither does Northwest, because it has abandoned this argument on appeal. The threat to McDonnell Douglas was real.

 Northwest argues that the "debt" paid by McDonnell Douglas was not one for which Northwest was primarily liable. First, Northwest asserts that it had no liability to the special plaintiffs because of its partial settlements in October 1989. Consequently, Northwest contends that only McDonnell Douglas's own tort liability remained unsettled when McDonnell Douglas paid the special plaintiffs.

Having examined Northwest's sealed "partial settlement" with the special plaintiffs, we are satisfied that the agreement did not extinguish the liability of either Northwest or McDonnell Douglas regarding the air crash. Without violating the secrecy of that sealed document, we think it is safe to say that the agreement represented by the "partial settlement" did little to determine the heart of the dispute between the plaintiffs and Northwest. The liability of both Northwest and McDonnell Douglas remained largely undetermined even after the October 1989 stipulations were entered. We refuse to treat Northwest's obligations to the special plaintiffs after that point as "satisfied," and we reject Northwest's contention that it had no outstanding obligation that McDonnell Doug-

las fulfilled by settling with the special plaintiffs.

Northwest's final argument against equitable subrogation focuses upon the release of Northwest that was effected when McDonnell Douglas settled with the special plaintiffs.[31] Northwest argues that even if its own partial settlement with the special plaintiffs did not extinguish its liability, there can be no dispute that its liability to the special plaintiffs ended when McDonnell Douglas settled these cases and secured Northwest's release. Northwest argues that once the special plaintiffs released Northwest from further liability, that release precluded McDonnell Douglas from seeking additional payments from Northwest.

 We conclude that the equitable doctrine of subrogation permits McDonnell Douglas to recover from Northwest even though the special plaintiffs released Northwest. Equitable subrogation is especially well-suited to allow recovery by an innocent settling party from the actual wrongdoer, and it has often been applied in this context. *See Kala*, 538 So.2d at 917–19; *Newcomer v. Masini*, 45 Wash.App. 284, 724 P.2d 1122 (1986); *Rawson v. Omaha*, 212 Neb. 159, 322 N.W.2d 381 (1982).

In *Kala*, a tenant was injured by a defective window. The landlord settled in full with the tenant, and the tenant dismissed the pending actions against the building architect and the window manufacturer. Kala, the building's owner, then sought indemnity or contribution from the architect and manufacturer. The defendants in the contribution action, much like Northwest, resisted payment on the grounds that the landlord's liability for the accident was never established. Finding that contribution and indemnity were unavailable to an innocent settling party, the court invoked the doctrine of equitable subrogation to permit the landlord to proceed against the parties responsible for the accident. The court reasoned that

---

**31.** Northwest asserts that it was effectively released twice from liability to the special plaintiffs when McDonnell Douglas negotiated its settlement. First, McDonnell Douglas negotiated with the special plaintiffs for Northwest's full release in return for the settlement payments, with the intention of seeking recovery from Northwest for these payments. Northwest also asserts that the terms of its partial settlement with the special plaintiffs provide for Northwest to be released from further liability to the plaintiffs if they reach a settlement agreement with McDonnell Douglas.

[i]f Kala is absolved of liability ... and yet left to bear the financial responsibility for the plaintiffs' loss after being found not at fault, the result would be highly inequitable, and the true wrongdoers would be unjustly enriched. It is precisely this result that the doctrine of equitable subrogation was fashioned to remedy.

*Kala*, 538 So.2d at 918–19.

The courts in *Newcomer* and *Rawson* were also confronted with an innocent settling party unable to recover from the wrongdoer under theories of contribution or indemnity. The doctrine of equitable subrogation enabled these courts to evade technical barriers to recovery and force the responsible party to accept liability.

We conclude that Michigan courts, having embraced the doctrine of equitable subrogation as a vehicle to allocate fairly losses among responsible parties, would permit McDonnell Douglas to recover from Northwest. We believe the opinions in *Atlanta Int'l* and *Auto Club* indicate the Michigan Supreme Court's desire to apply the doctrine of equitable subrogation broadly to avoid forcing an innocent settling party to bear a loss properly attributable to another.

In *Atlanta Int'l*, the Michigan Supreme Court applied equitable subrogation to permit an insurer to recover from a malpracticing attorney. The defendant attorney had been retained by the insurer to defend an insured party. The insurer's claim would normally have been barred by the absence of an attorney-client relationship between the insurer and the attorney. The court applied equitable subrogation to prevent the negligent attorney from forcing the blameless insurer to bear the loss caused by the attorney's negligence. 475 N.W.2d at 298–99. The court explained that "defense counsel's immunity from suit by the insurer would place the loss for the attorney's misconduct on the insurer.... Equity cries out for application under such circumstances." 475 N.W.2d at 298.

Similarly, in *Auto Club* the Michigan Supreme Court used equitable subrogation to avoid a formal barrier to recovery and to allocate fairly responsibility for a loss. In *Auto Club*, an injured party claimed medical benefits under two insurance policies. The plaintiff insurer chose to pay the medical bills without dispute, while reserving its right to dispute the coverage later. When the plaintiff insurer sought to recover from the defendant insurer, the plaintiff insurer's action was time barred, but the insured's action against the defendant insurer was still viable. The court used equitable subrogation to permit the plaintiff insurer to sue under the insured's cause of action, thereby avoiding the time bar and forcing the defendant insurer to bear its fair share of the liability. 485 N.W.2d at 698–700. The court was impressed by the fact that the plaintiff insurer promptly settled the insurance claim, which furthered Michigan's public policy favoring settlements. *Ibid.*

▮ *Atlanta Int'l* and *Auto Club* illustrate the use of equitable subrogation in Michigan to alleviate the burden suffered by an innocent party who chooses to settle promptly, with the intention of later recovering from the parties who are actually liable. This doctrine snugly fits the facts of this case. Yet Northwest complains that our application of equitable subrogation is unprecedented in Michigan.

▮ The only novelty Northwest identifies in the use of equitable subrogation in this case lies in the nature of the barrier to recovery that we permit McDonnell Douglas to surmount. Equitable subrogation in this case permits McDonnell Douglas to recover not only in the absence of a viable theory of contribution or indemnity, as in *Kala*, but also where McDonnell Douglas's settlement released Northwest from further direct liability to the special plaintiffs. Northwest argues that this release from liability creates a barrier to recovery that even equitable subrogation can not surmount, even under the compelling circumstances of this case. Because we believe that the prevention of unjust enrichment and the promotion of recovery by the innocent settler are the essence of equitable subrogation as applied in Michigan and elsewhere, we disagree.

▮ Northwest would have us narrowly tailor the application of equitable subrogation

to cases where indemnity or contribution are unavailable. This argument essentially seeks to limit the doctrine of equitable subrogation to the facts of *Kala, Newcomer,* and *Rawson.* However, the Michigan Supreme Court in *Atlanta Int'l* and *Auto Club* did not confine equitable subrogation to cases where the only bar to recovery was the unavailability of indemnity or contribution. In *Atlanta Int'l,* the innocent settler evaded a time bar to recovery. In *Auto Club,* the innocent settler evaded the doctrine of privity as a bar to recovery. The broad application of equitable subrogation in *Atlanta Int'l* and *Auto Club* directly contradicts Northwest's contention that McDonnell Douglas cannot avail itself of the doctrine when faced with a multi-million dollar burden for which Northwest, in the eyes of the jury, is completely responsible.

Our conclusion is supported by the Restatement of Restitution (1937), which has been cited with approval in Michigan. *Stefanac v. Cranbrook Educ. Community,* 435 Mich. 155, 458 N.W.2d 56, 75 (1993) The Restatement provides that "[a] person who has paid the debt of another in response to the threat of civil proceedings by a third person ... is entitled to restitution from the other if the payor acted to avoid trouble and expense." Restatement, § 71(2). The trial court specifically found that "McDonnell Douglas paid settlement monies in response to pending civil proceedings in an effort to avoid additional litigation and expense as well as to narrow the controversy." *Air Crash at Detroit Metro. Airport,* 791 F.Supp. at 1238.

 In deciding that equitable subrogation permits McDonnell Douglas to recover in the special defenses cases, we are mindful of the chilling effect on settlements that a contrary decision would have. Public policy in Michigan favors the negotiated settlement of civil disputes. *Hayes v. Coleman,* 338 Mich. 371, 61 N.W.2d 634 (1953). In the case at bar, Northwest refused to settle with the special plaintiffs. McDonnell Douglas, in contrast, chose to compensate the injured parties and focus the controversy between Northwest and McDonnell Douglas. McDonnell Douglas's strategy provided prompt payment for the special plaintiffs and reduced their legal expenses. The jury completely exonerated McDonnell Douglas from responsibility for the crash, and now McDonnell Douglas seeks to place the obligations arising out of the crash on the shoulders of the responsible party. If we prevent McDonnell Douglas from recovering after it has been exonerated, we will deter parties harboring any hope of innocence from settling. Shifting the accident liability onto Northwest's shoulders thus serves to promote settlement by allowing a party facing liability to settle with the hope of later recovery. The jury determined that Northwest was 100% responsible for the air crash, and we determine that the resulting liability must be borne by Northwest.

## IV

It is impossible to summarize completely in a concluding paragraph the results of the legal system's effort to cope with a tragedy of this magnitude. The deaths of 156 people resulted in five years of proceedings below, nineteen months of trial, 199 volumes of trial transcript, over 4000 evidentiary exhibits, and more than 3000 record entries reproduced in 77 volumes of Joint Appendix in our court, comprising 18,922 pages and eight videocassettes.

At the end of the day, however, we are firmly convinced that Chief Judge Cook and the jury provided a fair trial based on permissible rulings of law. In the words of Justice Minton, "There must be an end to litigation someday...." *Ackermann v. United States,* 340 U.S. 193, 198, 71 S.Ct. 209, 211, 95 L.Ed. 207 (1950). The judgment of the district court is AFFIRMED.